Gulfport-Biloxi Regional Airport Authority (Airport Authority) filed suit in the Chancery Court of the First Judicial District, Harrison County, Mississippi, against U.R.S. Company, Inc. (U.R.S.), McDaniel Bros. Construction Company, and Insurance Company of North America (INA), the surety on McDaniel's performance bond, for damages resulting from breach of contract in the building of an airport terminal building at the Gulfport-Biloxi Regional Airport. The lower court entered judgment in favor of the airport authority against U.R.S. and, on the cross-claim of INA, held that U.R.S. was liable for indemnity to INA. U.R.S. has appealed from the judgment and assigns three (3) errors in the trial below.
 FACTS
On July 28, 1978, a contract was entered into between U.R.S. and Airport Authority. This contract provided that U.R.S. would provide architectural services, including design, preparing construction documents, assisting in obtaining bids, and administering the construction contract for a new airport terminal building. For additional compensation, U.R.S. was to provide a full-time resident inspector for administration of the construction contract. This resident inspector hired by U.R.S. was Edward Craig. *Page 825 
The construction contract was subsequently let to McDaniel Bros. and was bonded by INA. Sometime during the fall of 1980, during the construction of the roof of the terminal, James Cooper, an expert in the roofing field, warned the Airport Authority Commissioner Ron Werby that the roof was not being put on in accordance with contract specifications. Werby instructed airport director Wayne Lindquist to check with Craig and U.R.S. regarding problems with the roof, and later personally requested Craig to make a special inspection of the roof. Craig agreed to do so and said not to worry, that the roof would be good and that Werby should not be concerned. In a later conversation, Cooper again advised Werby that nothing had changed as far as the roof construction was concerned. Again, Lindquist was directed to check with Craig and U.R.S. about this report. Again, they were told not to worry that the roof was fine. At the final inspection in August of 1981, before payment of a 10% retainage, Werby asked Cam McGill of U.R.S. whether the roof had been put on properly and whether it was a good roof. McGill responded, "You got a good roof. You don't have to worry about it."
In September, 1981, U.R.S. certified the construction was sufficiently complete, in accordance with the contract documents, for occupation by the airport authority. The airport authority, relying on the representations of U.R.S., accepted the building on September 17, 1981. At that time, the airport authority still held $248,900.94 in retainage, which was released to McDaniel Bros. in three payments. In late 1981, or early 1982, the roof began to leak. The airport authority twice contacted McDaniel Bros. to advise of the leaks and demand corrections before it paid the final retainage. McDaniel's attempted repairs failed to resolve the problem, and the airport authority retained James Cooper in December of 1982 to determine the cause of the leaks and repairs needed.
Cooper reported his findings to the airport authority on February 22, 1983. He testified the problems he found during his investigation were exactly the problems he had warned about in his first conversation with Werby in 1980 these being the same problems that he had first advised Edward Craig about. It was Cooper's testimony that the roof was not constructed in accordance with the plans, and that the deficiencies were obvious and should have been noted by the on-site inspector, Craig. Cooper further testified that many of the conditions he found should have been seen on inspection at the time the building was accepted. Cooper stated the problems could have been corrected for approximately $5,000 at that time, had his warning been heeded in 1980. Robert Carpenter, one witness, testified that Cam McGill of U.R.S. admitted to him, "Very frankly, we didn't do as good a job as we were capable of doing on that terminal building in either probably design or inspection."
Subsequently, the airport authority was forced to contract with Michael Baker, Architect and Engineers, of Jackson, to correct the problems with the roof. It was necessary to completely replace the roof and do major repairs to stop the leakage problem.
At the end of the trial, the chancellor awarded the following damages to the airport authority: $95,000 as the measure of damages for replacement of the roof; $7,000 in on-site inspection fees; and $26,638 as the cost of waterproofing the stucco halls for a total sum of $128,638. U.R.S. had also filed a counterclaim against the airport authority for withholding approximately $31,000. The chancellor ruled that these fees were unearned by U.R.S. and refused to enter a judgment in favor of U.R.S. on the counterclaim and found for INA on its cross-claim "for any funds INA pays on the judgment for the roof."
 I. — II. THE LOWER COURT ERRED IN FINDING U.R.S. COMPANY LIABLE TO THE AIRPORT AUTHORITY.
THE LOWER COURT ERRED IN FINDING THAT INSURANCE COMPANY OF NORTH AMERICA WAS ENTITLED TO INDEMNITY.
U.R.S. contends that the court erred in finding it liable to the airport *Page 826 
authority for the reason that the construction contract entered into between them absolves U.R.S. of any liability because of poor workmanship on the part of McDaniel Bros. U.R.S. quotes and relies upon the following excerpts from the construction contract:
 The consultant shall make periodic visits to the project site to adequately familiarize himself generally with the progress and quality of work, and to determine in general if the work is proceeding in accordance with the contract documents as set forth in Paragraph 2.1.5(a) of this agreement. On the basis of his on-site observations as a consultant, he shall endeavor to guard the owner against defects and deficiencies in the work of the contractor. The consultant shall not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the work as specified in the general conditions and/or special conditions, and any other provisions of the contract documents. The consultant shall not be responsible for construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the work, and he shall not be responsible for the contractor's failure to carry out the work in accordance with the contract documents.
Section 2.1.7(e).
 The consultant shall not be responsible for the acts or omissions of the contractor, or any sub-contractors, or any of the contractors' or sub-contractors' agents or employees, or any other persons performing any work.
Section 2.1.7(1).
 Through the on-site observations by full-time project representatives (clerks of the works) of the work in progress, the consultant shall endeavor to provide further protection for the owner against defects in the work; but the furnishing of such project representation shall not make the consultant responsible for construction means, methods, techniques, sequences or procedures, or for safety precautions and programs, or for the contractor's failure to perform the work in accordance with the contract documents.
Section 2.2.4.
However, the contract further provides in pertinent part:
 The consultant, as the representative of the owner during the construction phase, shall advise and consult with the owner during the construction phase, and all of owner's instructions to the contractor shall be issued through the consultant. The consultant shall have authority to act on behalf of the owner to the extent provided in general conditions unless otherwise modified in writing. Instruction relay shall be prompt and not result in delays for which the contractor may claim compensation for delay of the project.
Section 2.2.4.
 The consultant shall have the authority to reject work which does not conform to the contract documents. Whenever in his reasonable opinion, he considers it necessary or advisable to insure a proper implementation of the intent of the contract documents, he will have authority to require special inspection or testing of any work according with the provisions of the contract document, whether or not such work be then fabricated, installed, or completed, subject to approval of the owner, which approval shall not be unreasonably withheld or delayed.
Section 2.1.7(h).
Further, "basic services" are provided in the U.R.S. contract, and "project representation beyond basic services" is included. Basic administrative services are set forth in Section 2.1.7 of the U.R.S. contract and contain the following:
 (1) An implicit recognition that URS would be accountable for negligently administering the contract in the requirement that URS maintain professional liability insurance to protect GBRAA from URS errors and omissions. [§ 2.1.7(b)]
 (2) Exclusive authority of URS to issue GBRAA's instructions to the contractor. [§ 2.1.7(c)]
 (3) The requirement that URS make periodic visits to the project site to adequately *Page 827 
familiarize itself with the progress and quality of work and to determine if the work is proceeding in accordance with contract documents. On the basis of these on-site observations, URS was required to "endeavor to guard [GBRAA] against defects and deficiencies in the work of the contractor." [§ 2.1.7(e)]
 (4) The requirement that, based upon on-site observations and the contractor's applications for payment, URS determine the amount owing to the contractor and issue certificates for payment accordingly, said certificates constituting a representation by URS that the work has progressed to the point indicated; that to the best of URS's knowledge, information and belief the quality of the work is in accordance with the contract documents; and that the contractor is entitled to payment in the certified amount. [§ 2.1.7(f)]
 (5) Authority of URS to interpret the contract requirements and judge the performance thereunder by both GBRAA and the contractor, and responsibility of URS to decide all claims of GBRAA relating to the execution and progress of the work. [§ 2.1.7(g)]
 (6) Authority to URS to reject work not conforming to the contract documents and power of URS, subject to the approval of GBRAA, to require special testing of the work to insure proper implementation of the intent of the contract documents. [§ 2.1.7(h)]
The contract provided that U.R.S. would employ a full-time on-site project representative through whose inspection and keeping up with the work in progress, U.R.S. would "endeavor to provide further protection for [airport authority] against defects in the work." Edward Craig was the full-time representative, and the contract provided a substantial salary to him paid for by airport authority. Without question, U.R.S. had a duty to inspect the roof construction and to protect airport authority against defects and deficiencies in the work of the contractor, and would be liable for negligently performing that duty. U.R.S. had the duty to fill the position with a person competent to recognize deficient construction. As stated, deficiencies were pointed out not only to Craig, but to officers of U.R.S. The evidence reflects that, on a number of occasions, the improper construction of the roof was brought to the attention of those individuals and U.R.S.; that nothing was done to rectify the improper construction of the roof; and that Craig admittedly was not competent as an inspector on the roof work. U.R.S. breached the duties imposed upon it.
An architect is required to exercise ordinary professional skills and diligence and such duty is non-delegable. DickersonCo., Inc. v. Process Engineering Co., 341 So.2d 646 (Miss. 1977). The contract language in the Dickerson case was very similar to the contract language in the present case. There the Court said:
 The requirements that the architect's engineers be present at certain stages of construction and to certify progress payments and to make a final inspection and certification means that the architect's engineers will use reasonable care to see that the contractor constructs the building in substantial compliance with the plans and specifications.
341 So.2d at 652.
It is undisputed that the roof of the airport terminal building was not in compliance with the plans and the specifications of the building; that the workmanship was poor and shoddily done; that the representative of U.R.S. was on hand and was well aware of those conditions and circumstances; and in spite of his knowledge and the knowledge of U.R.S., the work was approved as O.K. and was certified for payment.
We are of the opinion that U.R.S. breached its duty to the airport authority, that the lower court correctly determined that the airport authority sustained damages as a result of that breach and was entitled to judgment for the amount of such damages.
U.R.S. Company contends that INA was not entitled to indemnity and that the lower court erred in finding that U.R.S. was liable for any amounts which INA was *Page 828 
required to pay as indemnity on the bond executed by it in favor of the airport authority. We are of the opinion that the lower court correctly decided that question in favor of INA. In Statev. Malvaney, 221 Miss. 190, 72 So.2d 424 (1954), the architect's contract obligated him to require that the contractor submit satisfactory evidence of payment of all payrolls, materials, bills, and other indebtedness connected with the work prior to the architect's approval for release of retainage. The architect approved, and the owner released, funds of the retainage without requiring such evidence. The lower court found that the architect and the surety were negligent in that the architect approved the release of funds without exercising due diligence to ascertain whether there were outstanding bills and the surety for failing to make inquiry about the performance of the contract or outstanding bills until after the contractor's default.
This Court reversed and rendered judgment for the surety for the full amount of the retaining funds released, holding that the architect was solely responsible for the release of retainage because of its failure to properly supervise the performance of the contract and preserve the retainage funds to insure its completion. The Court stated:
 The architect, therefore, undertook the performance of an act which, it was apparent, if negligently done would result in loss to the surety, and the law imposed upon him the duty to exercise due care to avoid such loss. We quote from 38 Am. Jur., pages 656-657, the following:
 "Accordingly, the law imposes upon every person who undertakes the performance of an act which, it is apparent, if not done carefully, will be dangerous to other persons or the property of other persons, the duty to exercise his senses and intelligence to avoid injury, and he may be held accountable at law for an injury to person or to property which is directly attributable to a breach of such duty. The duty so arising is absolute. The law requires nothing more; it will excuse nothing less than performance, although the degree of care to be exercised is relative to the circumstances of the case."
 * * * * * *
 It is readily apparent that the act of the architect in approving the release of the retainage funds was a contributing cause to the ultimate release of the fund which resulted in depriving the surety of its right to resort to those funds under the equitable doctrine of subrogation, resulting in loss to the surety to the extent of the amount of the funds released.
72 So.2d at 431, 432.
We are of the opinion that the judgment of the lower court should be affirmed on these issues for both the airport authority and INA.
 III. THE LOWER COURT ERRED IN DENYING THE COUNTERCLAIM OF U.R.S. COMPANY.
Certain invoices submitted by U.R.S. were refused payment by the airport authority and U.R.S. claims that the money was wrongfully withheld from paying them.
(1) Exhibit P-26 is for the balance of the design fee. That fee was $190,449.00 and there was only a small amount owing on it. Wayne Lindquist, executive director of the airport authority during the construction of the terminal, testified that this invoice was not paid because the terminal building was located approximately twenty feet from its designated location and the incorrect position of the building required the aircraft parking apron to be reduced in size, probably requiring enlargement later and criticism from the FAA. That testimony was undisputed.
(2) The design fee for interior/exterior access road was not paid by the airport authority because there was a difference in the alignment of the pipes because of a design error by U.R.S. Since the building as designed was twenty feet off design, the plumbing as laid by the plumbing contractors failed to match up to the building. The water lines were required to be repaired *Page 829 
and rerouted, which the airport authority had to pay for. Testimony was introduced to that effect and the amount involved was $5,967.00. On the issue of fact, the chancellor was not manifestly wrong.
(3) Exhibit E to P-26 was for survey work on access roads and is in the sum of $10,324.90. U.R.S. conducted survey work in order to bring roads into the airport terminal. It was discovered that this survey work had used incorrect points of reference and would bring a certain road through property that the airport authority did not own. Because of the error, the survey work had to be redone, and the airport authority offset that cost by the amount owing to U.R.S. for the original survey work conducted.
(4) U.R.S. complains of nine (9) invoices which deal with the payment of the salary of inspector Edward Craig. The total of the invoices is $2,438.82. Craig's salary was set at $25,000 and U.R.S. attempted to implement a raise for him. Airport authority refused to pay any sum over $25,000, which had been set. The chancellor was not manifestly wrong in refusing that claim of U.R.S.
We are of the opinion that the lower court did not err in denying the counterclaim of U.R.S. Company and assigned Error III is rejected.
There being no reversible errors in the trial below, the judgment of the lower court is affirmed.
AFFIRMED.
HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON and PITTMAN, JJ., concur.
BLASS, J., not participating.