United States Court of Appeals
Fifth Circuit

**F I L E D**

**January 3, 2007**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

—————————————

No. 05-60898

—————————————

LYNDON PROPERTY INSURANCE CO.

Plaintiff-Appellant,

versus

DUKE LEVY AND ASSOCIATES LLC

Defendant-Appellee.

—————————————————————————

Appeal from the United States District Court
for the Southern District of Mississippi
(No. 1:03-CV-310)

—————————————————————————

Before HIGGINBOTHAM, DENNIS, and CLEMENT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

Before the court is an appeal of the district court's grant of summary judgment in favor of

Duke Levy and Associates, LLC ("DLA"). We REVERSE the judgment of the district court

regarding the negligence claim and REMAND for proceedings not inconsistent with this opinion.

## I. FACTS AND PROCEEDINGS

The Hancock County Water and Sewer District ("District") entered into a contract with

Panther Utilities of Mississippi, Inc. ("Panther") to construct a sewage collection system. This

contract included two relevant documents: the Standard Form of Agreement Between Owner and

- 1 -

Contractor and the Standard General Conditions of the Construction Contract. The contract required that Panther achieve substantial completion by October 12, 2000, and final completion by November 11, 2000. Panther obtained a bond from Lyndon Property Insurance Company ("Lyndon"), the surety. The District also entered into a contract with DLA to serve as the engineer of record on the project. This contract included a standard document known as the Standard Form Agreement Between Owner and Engineer for Professional Services.

The project did not proceed as planned. On October 24, 2000, the District terminated Panther. At that time, DLA had accumulated $266,822.50 in inspection fees and $71,250.00 in contract administration fees. Lyndon, as the surety, funded the completion of the project. After a bidding process, Lyndon awarded the contract for completing the project to Cooley Contracting, Inc. ("Cooley"). Cooley subsequently completed the project, which involved substantial correction of Panther's work. Lyndon alleges that it paid more than $900,000 to fix and test work done by Panther that had been inspected and approved by DLA.

Lyndon filed a complaint against DLA in which it sought damages for negligence, breach of contract, and breach of warranty. DLA filed a motion for summary judgment. The district court granted DLA's motion on all claims and entered a final judgment. Lyndon timely filed a notice of appeal.[1]

## II. STANDARD OF REVIEW

This court reviews the district court's grant of summary judgment de novo. *Shell Offshore*

[1]Lyndon has abandoned its breach of contract and breach of warranty claims on appeal by failing to brief them. *See* FED. R. APP. P. 28(a)(9)(A); *Robinson v. Guarantee Trust Life Ins. Co.*, 389 F.3d 475, 481 n.3 (5th Cir. 2004) ("Failure adequately to brief an issue on appeal constitutes waiver of that argument.").

*Inc. v. Babbitt*, 238 F.3d 622, 627 (5th Cir. 2001). The district court's grant of "[s]ummary judgment is appropriate if the record shows 'that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.'" *Id.* (quoting FED. R. CIV. P. 56(c)).

## III. DISCUSSION

### A. Equitable subrogation

Lyndon argues that it should be able to recover in tort against DLA under the doctrine of equitable subrogation. Equitable subrogation is a doctrine whereby a surety is permitted to stand in the shoes of the party that benefitted from its performance of the surety obligation in order to prevent unjust enrichment on the part of a wrongdoer who caused the surety's expense. *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 136 (1962). "[P]robably there are few doctrines better established than that a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed." *Id.* at 136–37. Subrogees, however, have no greater rights than those of the assignor. *St. Paul Prop. & Liab. Ins. Co. v. Nance*, 577 So. 2d 1238, 1241 (Miss. 1991).

The caselaw supports the notion that Lyndon can stand in the shoes of the District. Subrogation requires (1) the party to have paid a debt to a third party on behalf of the other party and (2) that he must have been compelled to do so, such as by a surety agreement. *Prairie State Nat. Bank v. United States*, 164 U.S. 227, 231 (1896)*; see also Nance*, 577 So. 2d at 1240–41 (noting that "[s]ubrogation is the substitution of one person in place of another, whether as a creditor or as the possessor of any rightful claim"). Lyndon paid expenses for the District pursuant to the surety agreement and, therefore, can stand in the shoes of the District for the purpose of this action against DLA.

DLA argues that Lyndon cannot prove that the District suffered a loss, apparently because

Lyndon itself, as the surety, had to pay the costs of completion of the project.  For support, DLA

cites to *Bagwell Coatings, Inc. v. Middle-South Energy, Inc.*, 797 F.2d 1298 (5th Cir. 1986), but an

examination of this case shows it to be inapposite.  In *Bagwell*, the Fifth Circuit affirmed a judgment

of no liability in favor of an engineer that allegedly interfered with a subcontractor's ability to

complete its work in a timely fashion.  *Id.* at 1313.  The contractor alleged that mistakes by the

engineer led to a breach of the contract between the owner and the contractor.  *Id.* at 1301–02.  The

court found that the contractor had not proven a breach of the engineer's duty to the owner because

in a large, complicated construction project, a change with respect to one contractor may itself cost

money but may ultimately save the owner money in the overall construction process.  *Id.* at 1312.

DLA's argument bears no meaningful relationship to the facts of *Bagwell*.  DLA's argument

is simply that, regardless of whether or not there was a breach, the District suffered no loss because

Lyndon, as the surety, paid the difference.  This argument ignores the very principle behind the

doctrine of equitable subrogation.  By definition, the party into whose shoes the surety steps has not

suffered a loss because the surety protected it from that loss.  DLA cannot claim that the District

suffered no loss simply because Lyndon, rather than the District, paid the costs of DLA's alleged

negligence.  Lyndon should have been permitted to stand in the shoes of the District for the purpose

of this suit.

**B.**    **Exculpatory clause**

The Standard General Conditions of the Construction Contract contain a so-called

exculpatory clause which reads as follows:

> Neither ENGINEER'S authority to act under [the] Contract Documents nor any
> decision made by ENGINEER in good faith either to exercise or not exercise such
> authority shall give rise to any duty or responsibility of ENGINEER to

CONTRACTOR, any Subcontractor, any Supplier, or any other person or organization performing any of the Work, or to any surety for any of them.

The district court held that the exculpatory clause entitled DLA to "judgment as a matter of law on Lyndon's negligence claim."

In *U.R.S. Co. v. Gulfport-Biloxi Regional Airport Authority,* the owner of a construction project sued the project's architect, the project's contractor, and the contractor's surety. 544 So. 2d 824, 824–25 (Miss. 1989). In addition, the surety filed a counterclaim against the architect for retainage fees to account for costs the surety had paid because of faulty workmanship. The lower court found for the surety and the Supreme Court of Mississippi affirmed. The supreme court stated that "[a]n architect is required to exercise ordinary professional skills and diligence and such duty is non-delegable." *Id.* at 827.

DLA does not dispute this general characterization of duty but instead argues that the exculpatory clause saves it from liability to anyone but the District. Essentially, DLA argues that it disclaimed, by contract, potential liability to a surety standing in the shoes of the District. Under Mississippi law, "[c]lauses that limit liability are given strict scrutiny by this Court and are not to be enforced unless the limitation is fairly and honestly negotiated and understood by both parties." *Royer Homes of Miss., Inc. v. Chandeleur Homes, Inc.*, 857 So. 2d 748, 754 (Miss. 2003).

> The law does not look with favor on contracts intended to exculpate a party from the liability of his or her own negligence although, with some exceptions, they are enforceable. However, such agreements are subject to close judicial scrutiny and are not upheld unless the intention of the parties is expressed in clear and unmistakable language.

*Turnbough v. Ladner*, 754 So. 2d 467, 469 (Miss. 1999). When a project implicates the public interest, courts are even less deferential to any limitations of liability. *See Kroger Co. v. Chimneyville*

*Props., Ltd.*, 784 F. Supp. 331, 348–49 (S.D. Miss. 1991).  Here the exculpatory clause is not sufficiently clear to act as a limitation of liability under Mississippi law.  Furthermore, the District cannot bargain away the engineer's potential duty to a surety that would step into the District's shoes under the doctrine of equitable subrogation.  DLA's argument that the exculpatory clause insulates it from liability to Lyndon is without merit.

DLA also directs attention to the portions of the agreement that limit the engineer's liability to the District for the contractor's errors.  DLA argues that these portions mean that "DLA owed Lyndon no duty to require Panther to repair its work or withhold payment for deficient work, prior to Panther's default."  DLA tries to distinguish *U.R.S.* on a number of grounds, most prominently that the architect in *U.R.S.* "certified the project as complete and acceptable with the full knowledge that the roof had not been constructed according to the plans and specifications and was in fact defective," whereas here "Panther defaulted, and DLA did not have occasion to have the completed system tested and review and certify the final product."

These attempts to distinguish *U.R.S.* are unavailing, however, as Lyndon's claims are not based solely on DLA's failure to perform a final inspection of Panther's work.  Lyndon instead claims that DLA failed in other inspection and payment duties as well.  The exculpatory clause does not shield DLA from liability to Lyndon.

## C.    Breach

The district court found that Lyndon failed to establish a breach of a duty to the District by DLA.  In the summary judgment context, the reviewing court "views the evidence in the light most favorable to the non-movant." *Abarca v. Metro. Transit Auth.*, 404 F.3d 938, 940 (5th Cir. 2005).

It is clear that DLA owed at least some duty to the District. *U.R.S.*, 544 So. 2d at 827

(noting that architects are "required to exercise ordinary professional skills and diligence and such duty is non-delegable"). DLA argues that "the scope of [its] responsibilities may be limited by contract." DLA cites to *Hobson v. Waggoner Engineering, Inc.*, 878 So. 2d 68, 73–77 (Miss. Ct. App. 2003), for this proposition. *Hobson* is an intermediate appellate court decision stating that, in the absence of contractual provisions imposing such a duty, the engineer had "no duties or responsibilities for supervision of the work or project safety." *Id.* at 76. In *Hobson*, the plaintiff brought a wrongful death action alleging that the engineer's negligent supervision and design caused the death of an employee of one of the subcontractors working on the project. *Id.* at 70. The court found that the engineer had no duty to warn the employee. *Id.* at 76.

In *Mayor and City Council of Columbus v. Clark-Dietz & Associates-Engineers, Inc.*, a federal court in Mississippi stated that "in the absence of an active undertaking to guarantee the contractor's work, courts have ordinarily held that similar language absolves the architect of any liability for the contractor's poor workmanship." 550 F. Supp. 610, 627 (N.D. Miss. 1982). On the other hand, *Clark-Dietz*'s admonition that courts "ordinarily" do not impose liability on an engineer in such circumstances suggests that in some extreme cases liability is appropriate.

In *City of Mound Bayou v. Roy Collins Construction*, the Supreme Court of Mississippi stated that "[o]ne of the most important duties of an engineer/architect is to inspect the work to insure it is fully performed by the contractor. In fact an engineer/architect will be liable if he improperly releases funds to a contractor without adequately inspecting the construction site." 499 So. 2d 1354, 1359 (Miss. 1986) (internal citation omitted). While the contractual provisions in *Mound Bayou* appear to have imposed the duty to inspect on the engineer, the court's straightforward expression of the duty without reference to the specific contract in the case suggests it is not derived solely from such

contracts.

Turning to the contractual provisions present here, DLA was required to "make visits to the site at intervals appropriate to the various stages of construction as ENGINEER deems necessary in order to observe as an experienced and qualified design professional the progress and quality of the various aspects of Contractor(s)' work." In fact, DLA contacted Panther twice to note problems with the timing of the construction. The contractual language also supports a duty on behalf of DLA to inspect work before recommending payment.

The Supreme Court of Mississippi in *Mound Bayou* clearly stated that the engineer must "adequately" inspect a project before a release of funds is proper. 499 So. 2d at 1359 (upholding the lower court's finding in favor of the contractor and against the engineer and the owner). An engineer may be held liable at least in some egregious cases for failure to inspect and for improper recommendations of payment if the engineer failed to meet the standard of employing ordinary professional skills and diligence, even in the absence of contractual provisions specifically guaranteeing the contractor's work.

In opposition to the motion for summary judgment, Lyndon presented an expert's report articulating how DLA's actions and inactions failed to meet this standard. This report contains extensive detail about the actions and inactions of DLA as well as the expert's opinion that DLA "did not exercise ordinary professional skills and diligence in performing certain duties under the Contracts" and that DLA "should have observed the deficiencies with the work performed by Panther Utilities and either rejected the work or withheld payment for the work."

Viewing this report in a manner favorable to Lyndon, *see Abarca*, 404 F.3d at 940, it raises a genuine issue of material fact as to whether or not DLA breached its inspection and payment duties

- 8 -

to the District. Accordingly, the district court erred in granting DLA's motion for summary judgment.

## D. Economic loss rule

DLA argues that the economic loss rule shields it from liability. The economic loss rule is a doctrine restricting recovery in products liability to damages for physical harm, thereby excluding recovery for purely economic damages like those alleged here. DLA points to no Mississippi caselaw applying this doctrine outside of the realm of products liability. In this diversity case, we seek to apply the law of Mississippi as we believe the Supreme Court of Mississippi would. *Shanks v. AlliedSignal, Inc.*, 169 F.3d 988, 993 & n.7 (5th Cir. 1999). We therefore decline to apply the economic loss doctrine to this tort case involving a duty shaped by contract. *See Primrose Operating Co. v. Nat. Am. Ins. Co.*, 382 F.3d 546, 565 (5th Cir. 2004) (quoting *Webb v. City of Dallas*, 314 F.3d 787, 795 (5th Cir. 2002)).

## CONCLUSION

We REVERSE the judgment of the district court dismissing the negligence claim and REMAND for further proceedings not inconsistent with this opinion.