878 So.2d 68 (2003)
Pamela HOBSON, Individually and as Administratrix of the Estate of Charles Hobson, Deceased, Appellant/Cross-Appellee,
v.
WAGGONER ENGINEERING, INC. and National Seal Company, Appellees/Cross-Appellants.
No. 2001-CA-00908-COA.
Court of Appeals of Mississippi.
August 5, 2003.
Rehearing Denied December 16, 2003.
Certiorari Denied July 29, 2004.
*69 T. Jackson Lyons, Jackson, Clarence McDonald Leland, Brandon, for appellant.
Robert A. Biggs, David W. Mockbee, Jackson, and Julie Sneed Muller, attorneys for appellee.
Before KING, P.J., MYERS and GRIFFIS, JJ.
GRIFFIS, J., for the court.
¶ 1. Pamela Hobson, as the Administratrix of the Estate of Charles Hobson, filed a wrongful death action against Waggoner Engineering, Inc. ("Waggoner Engineering") and National Seal Company ("National Seal"). Charles Hobson's body was discovered in an aerated sewage lagoon under construction. Mr. Hobson's employer, Laird Electric, Inc. ("Laird"), was hired by the project general contractor, Carter and Mullings, Inc. ("Carter and Mullings"), as the electrical subcontractor. Waggoner Engineering was the engineering firm that had a contract with the City of Forest to design the lagoon. National Seal manufactured the liner that was installed around the lagoon.
¶ 2. The trial court sustained the motions for summary judgment, filed by Waggoner Engineering and National Seal, on the grounds that (1) Ms. Hobson failed to establish that Waggoner Engineering or National Seal owed any duty to the decedent, and (2) that even if Waggoner Engineering or National Seal owed a duty, Ms. Hobson failed to establish proximate cause. Finding no error, we affirm.

FACTS
¶ 3. In July of 1991, the City of Forest entered an owner/engineer agreement with Waggoner Engineering to design the expansion of the City's wastewater treatment plant (the "Project"). The City of Forest, after receiving several bids, entered an owner/contractor Agreement with Carter and Mullings to serve as general contractor on the Project. Carter and Mullings hired Laird Electric as an electrical subcontractor. Charles Hobson was an employee of Laird Electric who was working on the Project.
¶ 4. On the morning of April 16, 1993, a hard hat and a pack of cigarettes were *70 found floating in the sewage lagoon. Charles Hobson's body was found submerged in the lagoon. Apparently, Mr. Hobson was working near the lagoon and somehow entered the lagoon, where he drowned. No one saw Mr. Hobson enter the lagoon. There was no evidence presented to establish who or what caused Mr. Hobson to enter the lagoon.
¶ 5. Ms. Hobson filed a complaint for wrongful death in Scott County Circuit Court, on April 5, 1996, and named Waggoner Engineering, Carter and Mullings, and a fictitious entity which had manufactured the liner of the lagoon in which Mr. Hobson had drowned as defendants. Carter and Mullings was dismissed as Hobson's statutory employer. See Doubleday v. Boyd Construction Co., 418 So.2d 823, 826 (Miss.1982) (where prime contractor required subcontractor to secure policy of workmen's compensation insurance on its employees, prime contractor "secured" compensation insurance for benefit of subcontractor's employee within meaning and purpose of workmen's compensation statute and, therefore, was not "any other party" allowed by statute to be sued by employee or his dependents and was immune from employee's common-law negligence action). Carter and Mullings required Laird to secure a policy of workers' compensation insurance on its employees and was, therefore, immune from a separate negligence action.
¶ 6. In February of 1998, Ms. Hobson amended her complaint to add National Seal as a defendant. National Seal filed a motion to dismiss arguing that the statute of limitations had expired and that Ms. Hobson failed to demonstrate due diligence in identifying it as a defendant. The trial judge denied National Seal's motion.
¶ 7. Thereafter, Waggoner Engineering and National Seal filed motions for summary judgment. The trial judge granted the motions on two separate grounds. First, the trial court reviewed the various contracts governing the duties and responsibilities owed by Waggoner Engineering, Carter and Mullings, and National Seal and found that Carter and Mullings was responsible for the safety at the work site. The trial court concluded that Waggoner Engineering and National Seal owed no duty to Mr. Hobson.
¶ 8. Second, the trial court found that Ms. Hobson failed to establish proximate cause. The trial court determined that there were no eyewitnesses to the incident, that it was mere speculation as to how Mr. Hobson entered the lagoon, and that even if Mr. Hobson had slipped on the liner and fell in the lagoon, it was the result of his own negligence.
¶ 9. Ms. Hobson contends the trial court committed the following errors:
1. Waggoner Engineering, with an on-site representative responsible for monitoring compliance with plans and specifications, owed a duty to the decedent, Charles Hobson, to take due care to design a safe facility and to warn him of any dangers.
A. The existence and scope of duties of due care owed to workers implicates public policy which, given Waggoner's extensive supervisory authority of the construction, should not be set aside where Waggoner's full-time project representative was in a position to warn of hazards and knew or should have known of the hazards presented by the slick liner and the aerated water in which people cannot float.
B. Waggoner had a duty to produce a safe design which was not defective as having created a condition which was unreasonably hazardous to foreseeable persons *71 coming in contact with the construction based on design.
2. National Seal owed similar duties to Charles Hobson: it designed a defective product and failed to warn Hobson of dangers known to National Seal.
3. The Circuit Court erred in viewing the fact that no one saw Hobson enter the water as determinative of the question of legal cause. Causation may be established by circumstantial physical evidence and, generally, it is for the fact finder to determine cause on that basis.
¶ 10. National Seal cross-appealed asserting that (1) the trial court erred in overruling its motion to dismiss; (2) the trial court erred in its failure to find Ms. Hobson had not exercised due diligence in substituting National Seal as a defendant in a timely fashion; and (3) the trial court erred by failing to find that the statute of limitations had expired.

STANDARD OF REVIEW
¶ 11. In Aetna Casualty and Surety Co. v. Berry, 669 So.2d 56, 70 (Miss.1996), the Mississippi Supreme Court set forth the following standard of review for summary judgment:
This Court conducts de novo review of orders granting or denying summary judgment and looks at all the evidentiary matters before it  admissions in pleadings, answers to interrogatories, depositions, affidavits, etc. The evidence must be viewed in the light most favorable to the party against whom the motion has been made, that is, the non-movant is given the benefit of the doubt. If the moving party is entitled to judgment as a matter of law, summary judgment should forthwith be entered in his favor. Otherwise, the motion should be denied. Issues of fact sufficient to require denial of a motion for summary judgment obviously are present where one party swears to one version of the matter and another says the opposite. In addition, the burden of demonstrating that no genuine issue of fact exists is on the moving party.
Id. at 70 (citing Mantachie Nat. Gas v. Miss. Valley Gas Co., 594 So.2d 1170, 1172 (Miss.1992)). Additionally, the movant bears the burden of persuading the trial judge that: (1) no genuine issue of material fact exists, and (2) on the basis of the facts established, he is entitled to judgment as a matter of law. Pargo v. Elec. Furnace Co., 498 So.2d 833, 835-36 (Miss.1986); Smith v. Sanders, 485 So.2d 1051, 1054 (Miss.1986). Mere allegation or denial of material fact is insufficient to generate a triable issue of fact and avoid an adverse rendering of summary judgment. Sanders, 485 So.2d at 1054; Hill v. Consumer Nat'l Bank, 482 So.2d 1124, 1128 (Miss.1986).

ANALYSIS AND DISCUSSION OF LAW

I. Whether Waggoner Engineering had a duty to warn the Decedent of any dangers or whether Waggoner Engineering's design was defective.

A. Duty to Warn
¶ 12. The first assignment of error raises a question which is relatively new in the realm of Mississippi tort law. Mississippi has very little case law which addresses the duty of an engineer or architect to protect construction workers from harm while on the job site. Traditionally, architects and engineers have been shielded from liability, except in cases when due care was not exercised in the preparation of plans and specifications. 11-AUG Construction Law. 11, 11. However, in the past few decades more and more lawsuits have asserted that the project engineer or *72 architect has a duty to supervise the construction site to ensure safe operations. Id.
¶ 13. The Mississippi Supreme Court recognized this trend in Jones v. James Reeves Contractors, Inc., 701 So.2d 774 (Miss.1997). In James Reeves Contractors, Inc., an employee of a plumbing contractor was killed when the walls of an excavated manhole caved in and suffocated him. Id. at 776-77. His heirs sued numerous parties, including the project architect. Id. at 777. The trial court granted a summary judgment to the architect on the grounds that it owed no duty to the decedent. Id. at 783. The plaintiffs asserted the trial court erred because the architect knew that the subsurface soil conditions were wet, sandy and silty clay and failed to inform the general contractor of this danger. Id.
¶ 14. The supreme court held that the sole issue was whether there was a "common law duty to warn on the part of the architects based upon their prior knowledge of the dangerous soil conditions." Id. at 784. Recognizing the dearth of Mississippi case law on this subject, the supreme court examined the decisions other states applied. After a careful analysis, the supreme court relied on the decision in Young v. Eastern Engineering & Elevator Co., Inc., 381 Pa.Super. 428, 554 A.2d 77 (1989). In James Reeves Contractors, Inc., the supreme court held that "unless an architect has undertaken by conduct or contract to supervise a construction project, he is under no duty to notify or warn workers or employees of the contractor or subcontractor of hazardous conditions on the construction site" and affirmed the summary judgment. James Reeves Contractors, Inc., 701 So.2d at 786.
¶ 15. The supreme court also cited Hanna v. Huer, Johns, Neel, Rivers & Webb, 233 Kan. 206, 662 P.2d 243 (1983). In Hanna, an architect agreed to supervise the project; however, he did not agree to supervise safety issues. Hanna, 233 Kan. at 206, 662 P.2d at 244. The court established seven factors to determine whether supervisory powers go beyond the provisions of the contract:
(1) actual supervision and control of the work;
(2) retention of the right to supervise and control;
(3) constant participation in ongoing activities at the construction site;
(4) supervision and coordination of subcontractors;
(5) assumption of responsibilities for safety practices;
(6) authority to issue change orders; and
(7) the right to stop the work.
Id. at 219, 662 P.2d at 253-54. The Kansas court held that the architect did not have a contractual duty to provide for the safety of the plaintiffs and nothing in the record supported a finding that the architect by its actions undertook or could have impliedly assumed responsibility for safety procedures on the job site. Id. at 220-21, 662 P.2d at 253.
¶ 16. Additionally, in James Reeves Contractors, Inc., the supreme court cited Walker v. Wittenberg, Delony & Davidson, 241 Ark. 525, 412 S.W.2d 621 (1976). In Walker, the architect agreed to supervise construction but the general contractor had agreed to provide a safety coordinator. Id. The Arkansas court held that an architect must make an express agreement to supervise the construction site to incur liability. Id. at 532, 412 S.W.2d at 631.
¶ 17. In citing Hanna and Walker, the Mississippi Supreme Court noted:
[W]e philosophically disagree with the holdings of Hanna and Walker to the extent that they hold that a contractual *73 duty to maintain actual supervision over the details of the construction project does not entail the duty to supervise safety. It would seem natural that the supervision of safety is encompassed in the duty to supervise, and no separate agreement to supervise safety is necessary where the architect is supervising the details of every other aspect of the project.
James Reeves Contractors, Inc., 701 So.2d at 785.
¶ 18. Ms. Hobson contends the quoted language supports her claim that Waggoner owed a duty to the decedent regarding safety. While we interpret this language to mean that if the engineer has contracted to supervise every other aspect of the project besides safety, then liability, with regard to safety, may then be extended to the engineer in some circumstances, regardless of contractual obligations, we find this case is not one of those circumstances.
¶ 19. To begin our examination, we look to the various contracts among the parties. We first review the owner/engineer agreement between Waggoner Engineering and the City of Forest and then turn to the owner/contractor agreement between Carter and Mullings and the City of Forest. There was no separate agreement between Waggoner Engineering and Carter and Mullings.
¶ 20. According to the owner/engineer agreement, Waggoner had the following duties and responsibilities:
ARTICLE 1.1.2.1 Act as the OWNER's representative with duties and responsibilities and limitations of authority as described in the general conditions to the Construction Documents.
ARTICLE 1.1.2.3. Make periodic visits to the site of the construction to observe the progress and the quality of the construction work and to determine in general if the results of the construction work are in accordance with the drawings and the specifications. On the basis of his on-site observations as an ENGINEER, he shall endeavor to guard the Owner against apparent defects and deficiencies in the permanent work constructed by the Contractor but does not guarantee the performance of the Contractor. The ENGINEER shall not be required to make exhaustive or continuous on-site observations to check the quality or quantity of the construction Work. The ENGINEER is not responsible for construction means, methods, techniques, sequences or procedures, time of performance, programs, or for any safety precautions in connection with the construction Work. The ENGINEER is not responsible for the Contractor's failure to execute the work in accordance with the Construction Contract.
ARTICLE 1.1.2.5 The ENGINEER shall provide one or more full time resident project representatives.... By means of the more extensive on-site observations of the work in progress, the ENGINEER will endeavor to provide further protection for the OWNER against defects and deficiencies in the Contractor's work, but the furnishing of such services shall not include construction review of the Contractor's construction means, methods, techniques, sequences or procedures, or of any safety precautions or programs in connection with the work, and the ENGINEER shall not be responsible for the CONTRACTOR's failure to carry out the work in accordance with the Construction Contract.

ARTICLE 1.1.2.7 Notify the OWNER of permanent work which does not conform to the result required in the Construction *74 Contract, prepare a written report describing any apparent nonconforming permanent work and make recommendations to the OWNER for its correction and, at the request of the OWNER, have recommendations implemented by the CONTRACTOR.
ARTICLE 1.1.2.11. The ENGINEER shall not be responsible for the defects or omissions in the work result of the CONTRACTOR(s) or any subcontractor(s), or any of the CONTRACTOR's or subcontractor's employees or that of any other persons or entities responsible for performing any of the work result as contained in the Construction Contract.
ARTICLE 6.6.4. The ENGINEER has not been retained or compensated to provide design and construction review services relating to the CONTRACTOR's safety precautions or to means, methods, techniques, sequences, or procedures required for the CONTRACTOR to perform his work but not related to the final or completed structure, omitted services include but are not limited to shoring, scaffolding, underpinning, temporary retainment of excavations and any erection methods and temporary bracing.
(emphasis added).
¶ 21. Further, Attachment "C" to the owner/engineer agreement further provided, in pertinent part, that:
the furnishing of [the Resident Project Representative] services will not make ENGINEER responsible for or give ENGINEER control over construction means, techniques, sequences, or procedures or for safety precautions or programs, or responsibility for CONTRACTOR's failure to perform the work in accordance with the Contract Documents....
(emphasis added). Paragraph C.5 of Attachment "C" provided that the Engineer "[s]hall not advise or issue directions regarding or assume control over safety precautions and programs in connection with the Work."
¶ 22. Therefore, according to the express terms of the owner/engineer agreement, Waggoner Engineering had no duty or responsibility for the supervision of the construction work or project safety. While Ms. Hobson believes that James Reeves Contractors, Inc. supports her case, we find that it does not. We find nothing in the contract to indicate that Waggoner agreed to supervise the construction of the project or safety. Instead, the owner/contractor agreement between Carter and Mullings and the City of Forest imposed all such duties and responsibility for project supervision and safety on the general contractor, Carter and Mullings.
¶ 23. In the general conditions section of the owner/contractor agreement, Carter and Mullings accepted the following duties and responsibilities:
ARTICLE 6.1. The CONTRACTOR will supervise and direct the work. He will be solely responsible for the means, methods, techniques, sequences, and procedures of construction.

ARTICLE 6.8. The CONTRACTOR shall be fully responsible for all acts and omissions of its subcontractors and of persons and organizations either directly or indirectly employed by them and of persons and organizations for whose acts any of them may be liable to the same extent that he is responsible for the acts and omissions of persons directly employed by him.
ARTICLE 6.8.18. The CONTRACTOR will ... comply with all laws, ordinances, rules and regulations applicable to the Work.

*75 ARTICLE 6.19. The CONTRACTOR will be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the Work. He will take all necessary precautions for the safety of, and will provide the necessary protection to prevent damage, injury or loss to

6.19.1 All employees on the Work and other persons who may be affected thereby....
ARTICLE 6.20 The CONTRACTOR will designate a responsible member of its organization at the site whose duty shall be the prevention of accidents. This person shall be the CONTRACTOR's superintendent unless otherwise designated in writing to the CONTRACTOR to the OWNER.
(emphasis added).
¶ 24. The general conditions section of to the owner/contractor agreement also established the extent of Waggoner Engineering's duties and responsibilities during construction:
ARTICLE 9.5 The ENGINEER [Waggoner Engineering] will have authority to disapprove or reject work which is "defective" (which term is hereinafter used to describe Work that is unsatisfactory, faulty or defective or does not conform to the requirement of the Contract Documents or does not meet the requirements of any inspection, test or approval referred to in the Special Conditions or has been damaged prior to final acceptance).
ARTICLE 9.13 The ENGINEER will not be responsible for the construction means, methods techniques, sequences, or procedures; or the safety precautions or programs incident thereto and he will not be responsible for the CONTRACTOR's failure to perform the Work in accordance with the Contract Documents.
ARTICLE 9.14 The ENGINEER will not be responsible for the acts or omissions of the CONTRACTOR or any subcontractor or any of his or their agents or theirs employees, or any other persons performing any of the work.
(emphasis added).
¶ 25. Finally, the special conditions section of the owner/contractor agreement specifically addressed project safety:
Section 1-01.F. CONSTRUCTION SAFETY is a project requirement. The CONTRACTOR shall be responsible for providing any and all safety equipment and/or methods necessary for the precautions of the work by his personnel and the personnel of any sub-contractors, as well as providing safe access and site conditions to all elements of the Project for the OWNER, ENGINEER and their representatives. Such safety requirements shall meet guidelines as contained in OSHA and U.S. Department of Health and Human Services (National Institute for Occupational Safety and Health (NIOSH) publication sections relative to the work contemplated herein.)
Section 1-02.A. The CONTRACTOR ... shall take all necessary precautions to guard against damage to property and injury to persons.
Section 1-02.B. The CONTRACTOR shall put up and maintain in good condition, sufficient red or warning lights at night, suitable barricades and other devices necessary to protect the public.
(emphasis added)(bold in original).
¶ 26. Carter and Mullings, in turn, entered into a subcontract with Laird Electric, to perform certain electrical work on the Project. There was no separate agreement between Laird Electric and either Waggoner Engineering or the City of Forest.
*76 ¶ 27. Based on the owner/engineer agreement and the owner/contractor agreement, Waggoner Engineering had no duties or responsibilities for supervision of the work or project safety. Indeed, as in most construction projects, the general contractor alone had full and absolute control over the work site and the means and methods of construction. The general contractor decided who would be hired as subcontractors and material suppliers. The general contractor decided when the various subcontractors and material suppliers would perform their tasks. The general contractor was responsible for the supervision and coordination of the work between subcontractors and material suppliers. As a result, the general contractor was also responsible for the work performed by subcontractors and the materials installed in the Project. Likewise, the general contractor was responsible for the actions of subcontractors, including their employees, in the performance of their construction discipline or function.
¶ 28. As the Project engineer, Waggoner Engineering's primary responsibility was to make sure that the general contractor delivered a finished product that was constructed consistent with the Project's plans and specifications. Both the owner/engineer agreement and owner/contractor agreement establish that any and all responsibility for construction means or methods and Project safety rests solely with the general contractor, Carter and Mullings, and not with the Project engineer, Waggoner Engineering.
¶ 29. As in James Reeves Contractors, Inc., we review the seven factors in Hanna to determine whether the engineer's supervisory powers extended beyond the contract provisions. Based on the undisputed facts before the trial court, we agree with the trial court that Waggoner Engineering's duties and responsibilities did not. Waggoner Engineering did not have actual supervision or control of the work. Waggoner Engineering did not retain the right to supervise and control. The record contains minimal facts to determine Waggoner Engineering's level of participation at the construction site, but the contractual agreements are clear that its participation was to be kept to a minimum. There was no evidence presented to establish that Waggoner Engineering's participation went further than or beyond the requirements of the contractual agreements. Waggoner Engineering did not coordinate or supervise the subcontractors. Waggoner Engineering neither assumed responsibilities for safety practices nor could it issue change orders or stop work without first going through the City of Forest.
¶ 30. Under the standard established in James Reeves Contractors, Inc., no responsibility for the supervision of construction at the site was contracted for or assumed by Waggoner Engineering. Therefore, we find that Waggoner Engineering had no duty to warn Mr. Hobson, or any of the general contractor's workers or its subcontractors, of any dangers or to protect them from any harm. Accordingly, we affirm the trial judge's summary judgment on this issue.

B. Defective Design
¶ 31. Ms. Hobson next asserts that Waggoner Engineering's design for the sewage lagoon was defective because Waggoner Engineering should have known that the lagoon's slope was too steep and the liner was too slick for a person to climb out of the lagoon. Ms. Hobson claims that since Waggoner Engineering created a dangerous condition then it has a duty to a foreseeable person, who may encounter the condition, to make the design safe or to warn of the dangerous condition.
¶ 32. The trial judge did not specifically address this issue in granting the motion *77 for summary judgment and only ruled that Waggoner Engineering owed no duty to Mr. Hobson. From our de novo review of the record, we conclude that there is an absence of evidence presented to support this issue. Indeed, the plaintiffs offered no evidence of industry standards or practices concerning the proper design of an aerated sewage lagoons or any deviation therefrom by Waggoner Engineering in the preparation of the Project's plans and specifications. No expert testimony was offered to establish any available alternate design.
¶ 33. The only evidence of the lagoon's design was the deposition of Kirk Rosenhan. Mr. Rosenhan, an engineer and professor of engineering mechanics and industrial engineering at Mississippi State University, testified as to the coefficient of friction for the "wet plastic liner." Mr. Rosenhan testified that on a slope of nearly twenty degrees, the coefficient of friction of this plastic liner would be under 0.3 degrees. He concluded that this meant that the liner and the slope produced insufficient traction for a person to get out of the lagoon. Mr. Rosenhan did not testify or opine as to whether this type of design was common or if this design deviated from an industry standard.
¶ 34. Ms. Hobson offered no evidence to establish that there was a material fact in dispute on this issue. Mr. Rosenhan's testimony was simply not sufficient. If the design and construction of the liner and its slope had allowed sufficient traction for someone to get out of the lagoon, it is possible that such change would defeat the intended purpose of the lagoon. Indeed, the plaintiffs offered no evidence to establish that Waggoner Engineering's design of the lagoon was defective.
¶ 35. Mississippi law imposes on design professionals, including architects and engineers, the duty to "exercise ordinary professional skill and diligence." Dickerson Construction Co., Inc. v. Process Engineering Co., Inc., 341 So.2d 646, 652 (Miss.1977); Board of Trustees Utica Junior College v. Lee Electric Co., 198 So.2d 231, 234 (Miss.1967). Neither Mr. Rosenhan's testimony nor any other evidence indicated that Waggoner Engineering failed to meet this duty. Accordingly, we affirm the summary judgment on this issue.

II. Whether National Seal Company had a duty to warn the Decedent of any dangers or whether National Seal's liner design was defective.

A. Duty to Warn
¶ 36. Ms. Hobson asserts that National Seal was negligent in that it failed to warn workers about the slick nature of the liner. Ms. Hobson cites O'Flynn v. Owens-Corning Fiberglas, 759 So.2d 526, 535 (Miss.Ct.App.2000) for the proposition that manufacturers bear a common law duty to warn foreseeable persons about hazards. She asserts that the decedent was a foreseeable person, National Seal knew of the risk because of the warning contained in its contract, and they failed to warn of the dangers. She asserts that it was for a jury to decide if National Seal's actions were reasonable. We disagree.
¶ 37. National Seal was a subcontractor to Carter and Mullings. It manufactured and installed the liner for the sewage lagoon. By the express terms of its subcontract with Carter and Mullings, National Seal was to complete its work on the Project in twenty-one days and thereafter have no control or supervision of the work site. National Seal's work was completed almost one year before Mr. Hobson's death.
¶ 38. National Seal's contract with Carter Mullings stated:

*78 [o]verall safety of the job site, and the safety of individuals not employed by NSC will be the responsibility of the owner/general contractor. The owner or general contractor should be aware that the liner is slippery, particularly when wet. Care must be exercised when walking on the liner.

(emphasis added).
¶ 39. In determining whether Ms. Hobson has a cause of action against National Seal, we must first examine Mississippi products liability law. The Mississippi Products Liability Act, Miss.Code Ann. § 11-1-63 (Rev.2002), lays out the elements necessary to succeed on a claim for failure to adequately warn. The pertinent part of this statute reads:
(a) The manufacturer or seller of the product shall not be liable if the claimant does not prove by the preponderance of the evidence that at the time the product left the control of the manufacturer or seller:
(i) 2. The product was defective because it failed to contain adequate warnings or instructions,
(ii) The defective condition rendered the product unreasonably dangerous to the user or consumer; and
(iii) The defective and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought.
(c) (i) In any action alleging that a product is defective because it failed to contain adequate warnings or instructions pursuant to paragraph (a)(i)2 of this section, the manufacturer or seller shall not be liable if the claimant does not prove by the preponderance of the evidence that at the time the product left the control of the manufacturer or seller, the manufacturer or seller knew or in light of reasonably available knowledge should have known about the danger that caused the damage for which recovery is sought and that the ordinary user or consumer would not realize its dangerous condition.
(ii) An adequate product warning or instruction is one that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger and that communicates sufficient information on the dangers and safe use of the product, taking into account the characteristics of, and the ordinary knowledge common to an ordinary consumer who purchases the product; or in the case of a prescription drug, medical device or other product that is intended to be used only under the supervision of a physician or other licensed professional person, taking into account the characteristics of, and the ordinary knowledge common to, a physician or other licensed professional who prescribes the drug, device or other product.
(e) In any action alleging that a product is defective pursuant to paragraph (a)(i)2 of this section, the manufacturer or seller shall not be liable if the danger posed by the product is known or is open and obvious to the user or consumer of the product, or should have been known or open and obvious to the user or consumer of the product, taking into account the characteristics of, and the ordinary knowledge common to, the persons who ordinarily use or consume the product.
¶ 40. "A plaintiff has the burden of showing that the defect that allegedly was the proximate cause of injury existed at the time that the product left the hands of *79 the manufacturer, and that the defect rendered the product unreasonably dangerous." Wolf v. Stanley Works, 757 So.2d 316, 319(¶ 10) (Miss.Ct.App.2000). "Accordingly, the proof must support that no material change in that product occurred after leaving the manufacturer's control." Id.
¶ 41. In this case, we find that National Seal's warning, contained in its contract with Carter and Mullings, was sufficient. Additionally, we find that the dangerous nature of this product, in that it becomes slippery when wet, would be known to the ordinary user. Further, we hold that the liner's slippery nature is open and obvious.
¶ 42. We also agree with the trial judge's reliance on McGill v. City of Laurel, 252 Miss. 740, 173 So.2d 892 (1965), in determining National Seal owed no duty to Mr. Hobson. The judge quoted McGill, saying that, "[p]its and excavations on land embody no dangers that are not readily apparent to everyone, even very young children," and that, "[a]s a general rule, liability for injuries caused by dangerous instrumentalities terminates with a cessation of control thereover." McGill, 173 So.2d at 898, 900.
¶ 43. This Court finds that National Seal owed no duty to warn of dangers on the construction site to Mr. Hobson. The judgment of the trial court is therefore affirmed.

B. Defective Design
¶ 44. Ms. Hobson also alleges that National Seal's liner design was so slick as to present an unreasonable hazard to workers. She seems to claim that National Seal should have erected guard rails or a fence around the lagoon in order to correct this defect. She also seems to assert that the liner could have been manufactured with a more textured surface in the event someone contacted the liner.
¶ 45. To consider this issue, we again look to the pertinent portions of Mississippi Code Annotated § 11-1-63. The elements of a claim for defective design are as follows:
(a) The manufacturer or seller of the product shall not be liable if the claimant does not prove by the preponderance of the evidence that at the time the product left the control of the manufacturer or seller:
(1) 3. The product was designed in a defective manner,
(ii) The defective condition rendered the product unreasonably dangerous to the user or consumer; and
(iii) The defective and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought.
(b) A product is not defective in design or formulation if the harm for which the claimant seeks to recover compensatory damages was caused by an inherent characteristic of the product which is a generic aspect of the product that cannot be eliminated without substantially compromising the product's usefulness or desirability and which is recognized by the ordinary person with the ordinary knowledge common to the community.
(d) In any action alleging that a product is defective pursuant to paragraph (a) of this section, the manufacturer or seller shall not be liable if the claimant (i) had knowledge of a condition of the product that was inconsistent with his safety; (ii) appreciated the danger in the condition; and (iii) deliberately and voluntarily chose to expose himself to the danger in such a manner to register assent on the continuance of the dangerous condition.
(f) In any action alleging that a product is defective because of its design pursuant to paragraph (a)(i)3 of this section, the manufacturer or product *80 seller shall not be liable if the claimant does not prove by the preponderance of the evidence that at the time the product left the control of the manufacturer or seller:
(i) The manufacturer or seller knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the danger that caused the damage for which recovery is sought; and
(ii) The product failed to function as expected and there existed a feasible design alternative that would have to a reasonable probability prevented the harm. A feasible design alternative is a design that would have to a reasonable probability prevented the harm without impairing the utility, usefulness, practicality or desirability of the product to users or consumers.
To recover under this statute, Ms. Hobson must demonstrate that a dispute of a material fact existed that at the time the product left National Seal's hands, there was a feasible alternative design available that would have prevented the harm without impairing the usefulness of the product. Wolf, 757 So.2d at 320(¶ 11). We find that Ms. Hobson has failed to do so.
¶ 46. Here again, the trial court did not address this issue with specificity in its order granting summary judgment. As in the case with Waggoner, Ms. Hobson offered no evidence of industry standards or customs, no affidavits or deposition of any expert which would show that an alternate design is available which would have prevented the alleged harm, without impairing the usefulness of the product. She only suggests possible alternate designs in her brief and nothing in the record supports any factual or evidentiary basis for the suggested alternative designs. This Court also finds that the inherent nature of the liner, it slickness when wet, is something that cannot be changed without compromising its usefulness and this is a characteristic which would be obvious to a person with ordinary knowledge. We hold that there is no evidence in the record to establish that National Seal's liner was defectively designed. Therefore, we affirm the trial court's summary judgment.
¶ 47. Since there was no duty owed to Mr. Hobson by Waggoner Engineering or National Seal, we find this is dispositive of any issue regarding proximate cause. Likewise, since we affirm the trial court's summary judgment, the cross-appeal of National Seal is moot. Therefore, we decline to consider these issues.
¶ 48. THE JUDGMENT OF THE CIRCUIT COURT OF SCOTT COUNTY IS AFFIRMED AS TO DIRECT AND CROSS APPEALS. COSTS ASSESSED TO THE APPELLANT.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, THOMAS, LEE, MYERS AND CHANDLER, JJ., CONCUR. IRVING, J., CONCURS IN RESULT ONLY.