BARNES, J.,
for the Court:
FACTS AND PROCEDURAL HISTORY
¶ 1. This case stems from an accident that occurred during the construction of *1040 Anderson Regional Medical Center’s “Medical Towers III” expansion in Meridian, Mississippi. ARMC entered an agreement with Foil Wyatt Architects and Planners PLLC for the project’s design. Architect E. Bowden “Skip” Wyatt prepared the design drawings for Foil Wyatt.
¶ 2. The Medical Towers III construction began in 2008. Although there was no written agreement, Yates Construction was hired as the general contractor. Yates Construction then hired Spectrum II as the subcontractor for concrete services. Plaintiffs, David McKean, Francesco Medina, Donald Arrington, and Wayne Robertson, all worked for Spectrum II.
¶3. As of September 2008, the first-story reinforced concrete slab had been poured, and Yates Construction was preparing to pour the concrete walls and columns that would help support the elevated second-story reinforced concrete slab. Yates Engineering[1] became involved in the construction project when Dan Perry, Yates Construction’s general superintendent, asked engineer Ted Pope to prepare design drawings of the scaffolding and second-story formwork.[2]
¶ 4. During late September 2008, Pope visited the construction site and met with Mike Clark, a construction supervisor for Yates Construction. Pope noticed some formwork for the first-story concrete columns and walls, but he did not see any scaffolding for the second-story formwork.
¶ 5. During Pope’s visit, he and Clark discussed some of the necessary features of the scaffolding, such as the need for wooden 4"x4" posts and stringers, and 2"x4" joists. Pope prepared his preliminary design drawings, and submitted them for comments to Yates Construction on October 3, 2008. Meanwhile, Yates Construction had begun building the scaffolding before receiving Pope’s design drawings.
¶ 6. It is undisputed that Pope’s plan was fundamentally flawed in one significant way-it contemplated using twenty-four-foot posts. However, wooden 4"x4" posts are not available in that length. Consequently, the posts would have to be “tiered” by stacking them end to end and “spliced” for stability. Despite the fact that Pope’s plan was effectively impossible to follow, Yates Construction had no comments about Pope’s design. Yates Construction asked Pope to send a final version of his design drawings. Pope complied on October 6, 2014. However, Yates Construction ignored essential features of Pope’s scaffolding design.
¶7. On November 17, 2008, Spectrum II was pumping wet concrete into the second-story formwork when the scaffolding collapsed. It is undisputed that thé collapse was caused by the scaffolding rather than the formwork. The plaintiffs were injured when they fell to the ground.
¶8. On September 1, 2010, the plaintiffs sued Yates Construction. The plaintiffs claimed that Yates Construction negligently failed to build the scaffolding “in conformity with the plans and specifications set forth in the governing construction contract or otherwise in a safe and workmanlike manner.”
¶ 9. Yates Construction responded by filing a motion to dismiss the complaint and an answer. In the motion to dismiss, Yates Construction argued that because it had “effectively secured workers’ compen *1041 sation insurance coverage for the Plaintiffs, [it was] protected by the exclusive remedy provision(s) of the Mississippi Workers Compensation Act.” Alternatively, it argued that “as the general contractor, [it was] protected by the exclusive remedy provision(s) on account of the fact that the Plaintiffs, employees of a subcontractor, were provided workers’ compensation benefits for their alleged injuries.” Therefore, Yates Construction concluded that it was “statutorily immune from the suit brought by the Plaintiffs.”
¶ 10. In February 2011, the plaintiffs amended their complaint and added Yates Engineering and Foil Wyatt as defendants. According to the amended complaint, Yates Engineering and Foil Wyatt negligently failed “to design and formulate plans and specifications for the scaffolding” The plaintiffs also claimed that Yates Engineering and Foil Wyatt “were negligent in inspecting the scaffolding] and failed and/or refused to correct known deficiencies and defects in the construction [that] made it dangerous to use prior to the subject incident.”
¶ 11. In March 2012, the United States District Court for the Southern District of Mississippi ruled on a declaratory-judgment action that had been filed by American Resources Insurance Company Inc. The district court held that Yates Construction was the statutory employer of Spectrum II, and it was therefore immune from suit under tort theories. The circuit court subsequently dismissed the plaintiffs’ suit against Yates Construction.
¶ 12. In June 2012, the plaintiffs again amended their complaint by adding ARMC as a defendant. The plaintiffs claimed that ARMC negligently failed to require a written contract with Yates Construction. Additionally, the plaintiffs claimed that ARMC negligently failed to supervise and inspect Yates Construction’s work. Finally, the plaintiffs claimed that ARMC failed to maintain the premises in a reasonably safe condition and warn them of dangers.
¶ 13. On August 3, 2012, the plaintiffs designated engineer Ralph Sinno, Ph.D., as an expert. Dr. Sinno opined that defects in the scaffolding caused the collapse. Dr. Sinno did not attribute the collapse to any aspect of the formwork. Instead, Dr. Sinno stated that the formwork conformed to Foil Wyatt’s specifications.
¶ 14, Foil Wyatt’s motion for summary judgment had been pending since March 2012. At the plaintiffs request, Dr. Sinno submitted an affidavit opining that Foil Wyatt had a duty to inspect and supervise the construction of the scaffolding. However, Foil Wyatt successfully moved to exclude Dr. Sinno’s affidavit on the basis that, as an engineer, he was not qualified tó opine as to the duties of an architect. The plaintiffs have not appealed the circuit court’s decision to exclude Dr. Sinno’s affidavit. On November 27, 2012, the circuit court found that Foil Wyatt did not have a duty to inspect the scaffolding. Consequently, the circuit court granted Foil Wyatt’s motion for summary judgment.
¶ 15. On January 14, 2013, Yates Engineering filed a motion for summary judgment regarding plaintiff Medina. ARMC joined Yates Engineering’s motion. The circuit court granted the motion and held that as an alleged illegal immigrant, Fran-cesco Medina was not entitled to recover even if Yates Engineering and ARMC were found to be negligent.[3]
*1042 If 16. In August 2013, the circuit court granted summary judgment in favor of Yates Engineering. The circuit court’s decision was based on its conclusion that “[a]t no point in time did Yates Engineering assume the duty [to] inspect or supervise the construction and implementation of its design drawings either by contract or conduct.” The circuit court later granted ARMC’s motion for summary judgment. According to the circuit court, “no genuine issue of material fact remains with respect to Plaintiffs’ claims against [ARMC], and therefore, [ARMC] is entitled to summary judgment on Plaintiffs’ claims against it.” The circuit court also entered a final judgment on that date.
¶ 17. The plaintiffs appeal. They argue that the circuit court erred when it granted summary judgment in favor of Yates Engineering, Foil Wyatt, and ARMC. Yates Construction and ARMC have filed cross-appeals that need only be addressed if this Court reverses the circuit court’s grant of summary judgment in their favor.
STANDARD OF REVIEW
¶ 18. An appellate court reviews a trial court’s decision to grant a motion for summary judgment de novo. Karpinsky v. Am. Nat’l Ins. Co., 109 So.3d 84, 88 (¶ 9) (Miss.2013). “[I]f the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law,” then summary judgment “shall be rendered.” M.R.C.P. 56(c). The evidence must be viewed “in the light most favorable to the party against whom the motion has been made.” Karpinsky, 109 So.3d at 88 (¶ 9).
ANALYSIS
I. Yates Engineering
¶ 191 According to the plaintiffs, there is a genuine issue of material fact regarding whether Pope breached his duty to design a scaffolding system that would support the formwork and the wet concrete. The plaintiffs also claim that there is a genuine issue of material fact regarding whether Pope breached his duty to inspect the scaffolding that Yates Construction built before Spectrum II poured the concrete. “To prevail in any type of negligence action, a plaintiff must first prove the existence of a duty.” Enter. Leasing Co. S. Cent., Inc. v. Bardin, 8 So.3d 866, 868 (¶ 7) (Miss.2009). “[W]hether a duty exists in a negligence case is a question of law to be determined by the court.” Id. An appellate court reviews questions of law de novo. Facilities Inc. v. Rogers-Usry Chevrolet Inc., 908 So.2d 107, 110 (¶ 5) (Miss.2005).

A. Duty of Professionalism

¶20. “Mississippi law imposes on design professionals, including architects and engineers, the duty to exercise ordinary professional skill and diligence.” Hobson v. Waggoner Eng’g Inc., 878 So.2d 68, 77 (¶ 35) (Miss.Ct.App.2003). Perry admitted that Yates Construction began building the scaffolding before it received Pope’s design drawings. It is unclear how much of the scaffolding had been built when Yates Construction received Pope’s design drawings. In any event, Pope’s scaffolding design was fundamentally flawed because it contemplated using 4"x4" *1043 posts that were twenty-four feet tall. Yates Construction could not possibly comply with Pope’s design, because 4"x4" posts are not available at that length. Consequently, the posts would have to be “tiered” by stacking them end to end and “spliced” for stability. Because Pope’s design did not contemplate using “tiered” posts, his plans did not include the design features necessary to “splice” the posts.
¶ 21. Pope submitted his design drawings to Yates Construction for review and an opportunity to comment. Despite the fact that Pope’s design drawings were effectively impossible to follow, Yates Construction made no comment about Pope’s design. Instead, Yates Construction asked Pope to send final versions of his design drawings. Pope complied on October 6, 2014. There is no evidence that the design reflected in the initial drawings was any different than the design reflected in the final versions. Instead of seeking clarification or revision from Pope, Yates Construction acted on its own and “spliced” the posts by fastening a three-quarter-inch strip of plywood on opposite sides of the stacked posts above and below the point where the two posts met. The plaintiffs’ expert engineer, Dr. Sinno, reported that Yates Construction’s splicing method was “an invitation to catastrophic splicing failure of the entire framing of the scaffolding.”
¶22. Yates Construction also ignored Pope’s bracing specifications. Instead of using 2"x4" diagonal and horizontal brac-ings as contemplated in Pope’s plan, Yates Construction used l"x4" bracings. According to Dr. Sinno, “[t]he lack of adequate diagonal and continuous cross-bracings from top to bottom of the scaffolding resulted in the instability of the entire framing causing the formwork to collapse.” Noting that “[t]he details of the as-built scaffolding on the site are far from th[o]se in the design drawings,” Dr. Sinno opined that “the cause of the failure did lie in the as-built scaffolding and not in the design on paper that was not used.” (Emphasis added).
¶ 23. Even if Pope’s design was inadequate in one aspect, the fact remains that there is no evidence that Yates Construction actually used his design. Instead of seeking clarification regarding the fact that Pope’s design called for twenty-four-foot posts that could not actually be obtained, Yates Construction used its own design to “splice” the posts. And Yates Construction ignored the fact that Pope’s design called for 2"x4" diagonal and lateral bracings. Yates Construction simply decided to use l"x4" bracings instead. The plaintiffs’ expert reported that the failure was caused by the “as-built scaffolding and not in the design on paper that was not used.” Stated differently, there is no evidence that Pope’s design caused the plaintiffs’ injuries. Without any evidence, there can be no genuine issue of material fact regarding causation. It follows that summary judgment is appropriate regarding the plaintiffs’ negligent-design claim against Pope and Yates Engineering.

B. Duty to Inspect

¶24. According to the plaintiffs, Pope negligently failed to inspect the scaffolding before Spectrum II poured the concrete. Dr. Sinno’s report states that Pope “failed to inspect the formwork before casting of the concrete.”[4] However, during his deposition, Dr. Sinno was asked whether Pope had a duty to preapprove *1044 the scaffolding and formwork before the concrete was poured. Dr. Sinno responded, “No, he’s the designer of the scaffolding.”
¶ 25. The plaintiffs cite no authority to support the conclusion that Pope had an absolute duty to inspect the scaffolding and formwork to ensure that Yates Construction followed his design. “Only in limited circumstances will [an engineer], independently of express contract language, have a duty to supervise the construction site to ensure safe operations.” Family Dollar Stores of Miss., Inc. v. Montgomery, 946 So.2d 426, 430 (¶ 12) (Miss.Ct.App.2006). “Unless [an engineer] has undertaken by conduct or contract to supervise a construction project, he is under no duty to notify or warn workers or employees of the contractor or subcontractor of hazardous conditions on the construction site.” Id. (quoting Jones v. James Reeves Contractors, 701 So.2d 774, 786 (Miss.1997)). It is undisputed that there was no written agreement between Yates Engineering and Yates Construction that required Pope to inspect the form-work or scaffolding.
¶ 26. There are “seven factors to determine whether supervisory powers go beyond the provisions of [a] contract.” Hobson, 878 So.2d at 72 (¶ 15) (citations omitted). Those factors are:
(1) actual supervision and control of the work; (2) retention of the right to ' supervise and control; (3) constant participation in ongoing activities at the construction site; (4) supervision and coordination of subcontractors; (5) assumption of responsibilities for safety practices; (6) authority to issue change orders; and (7) the right to stop the work.
Id. On appeal, the plaintiffs argue that Pope inspected the “already existent beginnings of the very structure that he was commissioned to design.” But a careful examination of Pope’s deposition testimony reflects that the scaffolding and formwork that existed when he visited the site related to the concrete columns and walls that would later help support the second floor-not the actual second floor, itself. Stated differently, the formwork and scaffolding that was in place during Pope’s visit was not the scaffolding and formwork that he was commissioned to design. Pope did not know that after his visit to the site, Yates Construction began building the scaffolding and formwork before it received his design drawings.
¶27. Pope unequivocally said that he did not visit the construction site to determine whether Yates Construction followed his design. According to Pope, after his initial visit to the site, he next visited it after the formwork collapsed. On an OSHA form, Perry indicated that “the erected form work [had been] inspected by a qualified engineer” approximately one week before Spectrum II poured the concrete. Perry also indicated that he had accompanied the unspecified engineer during the inspection. During his deposition, Perry said he “thought ... Ted Pope” had inspected the scaffolding and formwork because he' “saw him out there ■ one day.” When asked whether Pope had been “walking around looking at the [scaffolding,]” Perry responded that he “saw him at the office[, w]hich is a block away.” However, when pressed further on the subject, Perry admitted: “[W]e didn’t have ... an engineer look at it.” Said differently, Perry conceded that his original answer on the OSHA form was not accurate.
¶28. There is no evidence that Pope was involved in the “actual supervision and control of the work.” He did not retain any “right to supervise and control” it, and he did not supervise or coordinate any of the subcontractors. Nor did he assume *1045 any responsibility for safety practices at the construction site. There was no evidence that he had any authority to issue orders or stop work at the site. As for whether there was evidence of Pope’s “constant participation in ongoing activities at the construction site,” in the light most favorable to the plaintiffs, Perry conceded that on an OSHA form, he incorrectly stated that he had once seen Pope approximately one block away from the site. Perry also conceded that Yates Construction did not have an engineer inspect the scaffolding before Spectrum II poured the concrete. The evidence does not support the conclusion that Pope had a duty to inspect the scaffolding. There is no merit to the plaintiffs’ claim that summary judgment in favor of Yates Engineering was inappropriate.
II. ARMC
¶ 29. The plaintiffs claim that the circuit court erred when it granted ARMC’s motion for summary judgment. According to the plaintiffs, there is a genuine issue of material fact regarding whether ARMC breached its duty as the owner of the property to provide them with a reasonably safe working environment. The plaintiffs also claim that ARMC is vicariously liable for Yates Construction’s behavior based on an agency relationship between ARMC and Yates Construction.
¶ 80. Mississippi Code Annotated section 11-1-66 (Rev.2004) provides that “[n]o owner ... of property shall be liable for the ... injury of an independent ... contractor’s employees resulting from dangers of which the contractor knew or reasonably should have known.” Additionally, “Mississippi common law protects business owners from injuries sustained by independent contractors on the work site.” McSwain v. Sys. Energy Res., Inc., 97 So.3d 102, 108 (¶ 18) (Miss.Ct.App.2012). In the context of a construction project, a property owner has a duty to surrender a reasonably safe working environment to a contractor. Saranthus v. Health Mgmt. Assocs., Inc., 56 So.3d 1274, 1276 (¶ 10) (Miss.Ct.App.2011). That duty contemplates warning a contractor about any hidden dangers on the property that existed before the work began. Bevis v. Linkous Constr. Co., 856 So.2d 535, 539 (¶ 9) (Miss.Ct.App.2003). The plaintiffs do not claim that ARMC negligently failed to warn them about a hidden danger on the property.
¶ 31. After the property owner surrenders the property to the contractor, the contractor assumes a “duty to warn or otherwise protect” his employees and agents on the property. Id. The contractor’s duty to warn others also applies to his subcontractors and their employees. Id. However, the Mississippi Supreme Court has stated that the outcome may be different “[i]f [a plaintiff] can show that ... the owner maintained substantial de facto control over those features of the work out of which the injury arose.... ” Magee v. Trans. Gas Pipe Line Corp., 551 So.2d 182, 186 (Miss.1989). “What is critical is whether the project owner maintains any right of control over the performance of that aspect of the work that has given rise to the injury.” Id. Stated differently, when a property owner contracts its responsibility for the site to a general contractor, and there is no evidence that the property owner maintained any control over an instrumentality that injured a subcontractor’s employee, the property owner is not liable for the employee’s injuries. Avent v. Miss. Power & Light Co., 94 So.3d 1199, 1205 (¶ 24) (Miss.Ct.App.2011).
¶ 32. There is no evidence that ARMC maintained any right to control the design or construction of the scaffolding that collapsed. Instead, the plaintiffs claim that *1046 ARMC maintained control of the property in general both directly and through its alleged agency status through Yates Construction. The plaintiffs note that there was no written agreement between ARMC and Yates Construction. However, it is undisputed that ARMC employees were not even allowed on the construction site without first obtaining Yates Construction’s permission. During his deposition, Denton Farr, ARMC’s vice president of operations, said that he was not allowed on the construction site without first obtaining Yates Construction’s permission. He further explained that when he was allowed on the construction site, he “was always accompanied by somebody from Yates.” His visits to the construction site were “not consistent and ... not often.” Farr stated that no one employed by ARMC inspected the construction site for safety purposes because ARMC did not “have anybody in that role” and “nobody at [ARMC] ha[d] that expertise.” The plaintiffs further note that Denton Farr, ARMC’s vice president of operations, attended regular project meetings. During his deposition, Farr explained that ARMC simply wanted to be informed of the construction progress. “The fact that [the property owner] had employees [who] conducted periodic inspections on the work could change nothing” about the fact that the property owner had surrendered control of the premises to a contractor. Magee, 551 So.2d at 185-86.
¶ 33. Finally, the plaintiffs’ derivative claim against ARMC also fails as a matter of law. Assuming for the sake of discussion that Yates Construction was ARMC’s agent, Yates Construction was found to be the plaintiffs’ statutory employer for the purpose of workers’ compensation benefits. The plaintiffs do not challenge Yates Construction’s status as their statutory employer. In other words, the plaintiffs have successfully obtained their exclusive remedy against Yates Construction. “[B]ecause vicarious liability derives solely from the principal’s legal relation to the wrongdoer, settlement with the tortfeasor removes the basis for any additional recovery from the principal upon the same acts of negligence.” J & J Timber Co. v. Broome, 932 So.2d 1, 6 (¶ 20) (Miss.2006) (quoting Biddle v. Sartori Mem’l Hosp., 518 N.W.2d 796, 798 (Iowa 1994)). So even if we found merit to the plaintiffs’ agency claim, they would have no basis to recover additional damages against ARMC.
¶ 34. As a matter of law, ARMC did not have a duty to warn the plaintiffs about the condition of the scaffolding that Yates Construction designed and built. The scaffolding did not exist at the time that ARMC surrendered control of the property to Yates Construction, and ARMC had no control over any aspect of the scaffolding. And even if we found that Yates Construction was ARMC’s agent, having resolved their claims against Yates Construction, the plaintiffs would not be able to recover further from ARMC. This issue has no merit.
III. Foil Wyatt
¶35. Finally, the plaintiffs argue that the circuit court erred when it granted Foil Wyatt’s motion for summary judgment. According to the plaintiffs, Foil Wyatt had a contractual duty to inspect the formwork and scaffolding before Spectrum II poured the concrete for the second-story slab. The plaintiffs also claim that Foil Wyatt’s conduct created a duty “to ensure the integrity of the concrete formwork.” The plaintiffs conclude that there was a genuine issue of material fact regarding whether Foil Wyatt “breached its contractual and professional duties in the premises.” “Questions concerning the *1047 construction of contracts are questions of law that are committed to the court rather than questions of fact committed to the fact[-]finder.” Facilities Inc., 908 So.2d at 110 (¶ 5).

A. Contract Liability

¶ 36. In 1992, ARMO and Foil Wyatt signed an “AIA-B141 Owner/Architect Agreement” (the B141 Agreement), which states:
[Foil Wyatt] shall not have control over or charge of and shall not be responsible for construction means, methods, techniques, sequences[,] or procedures, or safety precautions and programs in connection with the work, since these are solely the Contractor’s responsibility.... [Foil Wyatt] shall not have control over or charge of acts or omissions of the Contractor, Subcontractors, or their agents or employees, or of any other persons performing portions of the Work.
“The primary purpose of all contract construction principles and methods is to determine and record the intent of the contracting parties.” Id. at (¶ 6). “In contract construction eases, [an appellate court’s] focus is upon the objective fact— the language of the contract. We are concerned with what the contracting parties have said to each other, not some secret thought of one not communicated to the other.” Id. at 110-11 (¶ 6).
¶ 37. The unambiguous language of the B141 Agreement states that Foil Wyatt is not responsible for construction methods or safety precautions “in connection with the work.” The temporary scaffolding at issue was intended to support the formwork while the wet concrete within it hardened. Stated differently, the scaffolding was a means to build the project’s second-story floor. Therefore, Foil Wyatt is not contractually responsible for ensuring that the scaffolding design was adequate to support the formwork, the steel concrete reinforcement, and the wet concrete while it hardened. Nor was Foil Wyatt contractually obligated regarding any necessary safety precautions related to the scaffolding.
¶ 38. Furthermore, Foil Wyatt had no contractual duty to inspect the scaffolding before Spectrum II poured the concrete. The B141 Agreement states that Foil Wyatt “shall visit the site at intervals appropriate ... to determine ... that the Work when completed will be in accordance with the Contract Documents.” The “Contract Documents” are defined as Foil Wyatt’s “Drawings and Specifications setting forth in detail the requirement for the construction of the Project.” The “Contract Documents” do not include any drawings or specifications related to the scaffolding. They merely state that “adequate bracing and forming is required” and “[e]oncrete construction tolerances shall conf[o]rm to ACI Standard 347 Chapter 203-1, ‘Tolerances for Reinforced Concrete Buildings.’ ” Because the Contract Documents do not address the scaffolding, Foil Wyatt was not obligated to inspect the scaffolding to ensure that it was in compliance.

B. Liability Through Conduct

¶ 39. As stated above, Foil Wyatt had a common-law duty “to exercise ordinary professional skill and diligence.” Hobson, 878 So.2d at 77 (¶ 35). There are limited circumstances in which an architect has an extra-contractual “duty to supervise the construction site to ensure safe operations.” Montgomery, 946 So.2d at 430 (¶ 12). “Unless [an architect] has undertaken by conduct or contract to supervise a construction project, he is under no duty to notify or warn workers or employees of the contractor or subcontractor of hazard *1048 ous conditions on the construction site.” Id. (quoting Jones, 701 So.2d at 786). There are “seven factors to determine whether supervisory powers go beyond the provisions of [a] contract.” Hobson, 878 So.2d at 72 (¶ 15) (citations omitted). Those factors are:
(1) actual supervision and control of the work; (2) retention of the right to supervise and control; (3) constant participation in ongoing activities at the construction site; (4) supervision and coordination of subcontractors; (5) assumption of responsibilities for safety practices; (6) authority to issue change orders; and (7) the right to stop the work.

Id.

¶ 40. Wyatt visited the construction site on a weekly basis, but there was no evidence that he actually supervised or controlled the construction of the scaffolding. During his weekly visits, he usually walked around the site to see how much work had been completed so he could certify payments to Yates Construction. Because the finished concrete was Foil Wyatt’s responsibility, Wyatt inspected the rebar and the formwork before Spectrum II poured the concrete. However, he did not review Pope’s scaffolding design drawings, and he did not inspect the scaffolding that Yates Construction built. And although Foil Wyatt had the general authority to reject work that did not conform to the Contract Documents, it had no authority to stop the work. Only ARMC had the authority to stop work on the project.
¶41. There is no evidence that Foil Wyatt undertook to supervise any aspect of the scaffolding. Therefore, Foil Wyatt had no duty to warn the plaintiffs that the scaffolding that Yates Construction built was inadequate. It follows that the plaintiffs’ claim against Foil Wyatt fails as a matter of law. We find no merit to this issue.
CONCLUSION
¶ 42. It is undisputed that the scaffolding collapsed because Yates Construction did not build it properly. The plaintiffs’ expert unequivocally stated that the collapse was not related to Pope’s design, because Yates Construction did not follow Pope’s specifications. Neither Yates Engineering, Foil Wyatt, nor ARMC had a duty to inspect the scaffolding that Yates Construction built. The circuit court did not err when it granted summary judgment in favor of Yates Engineering, Foil Wyatt, or ARMC. Because these conclusions are dispositive, Medina’s claim that the circuit, court erred in dismissing his claim due to his immigration status is moot; this opinion should not be construed as implicit agreement with the circuit court’s ruling in this regard. The cross-appeals are also moot. We therefore affirm the circuit court’s judgment.
¶ 43. THE JUDGMENT OF THE LAUDERDALE COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., ISHEE, MAXWELL, FAIR AND WILSON, JJ., CONCUR. CARLTON, J„ CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. JAMES, J., DISSENTS WITH SEPARATE WRITTEN OPINION.

. Yates Engineering was described as a "sister company” of Yates Construction.

. The formwork essentially serves as a mold for the reinforced concrete while it dries. The scaffolding acts as a temporary support for the formwork and the wet concrete.

. Specifically, the circuit court held:
Medina, invoking the Fifth Amendment, has repeatedly declined to verify his citizenship or his immigrant/work status during his deposition testimony. Therefore, the Court can only surmise that Medina is an illegal immigrant. The very injuries for which the plaintiff seeks recovery arose during the *1042 course of his illegal employment. But for his illegal employment, Medina would not have been injured during the construction accident. In this Court's opinion, to allow Medina to recover for injuries sustained during the course of his own illegal conduct would be contrary to public policy.

. Wyatt said that he and Perry inspected the formwork to ensure that wet concrete would not leak out of it. Wyatt added that he did not know whether the scaffolding was finished at that time, and he did not inspect it.