# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-01170-COA

THOMAS FORTNER AND LAURILYN             APPELLANTS
FORTNER, INDIVIDUALLY AND AS
WRONGFUL DEATH BENEFICIARIES OF
FRANCES FORTNER, DECEASED, THE
ESTATE OF FRANCES FORTNER, DECEASED,
AND CITY OF JACKSON, MISSISSIPPI

v.

IMS ENGINEERS, INC. AND INTEGRATED          APPELLEES
MANAGEMENT SERVICES, INC.

DATE OF JUDGMENT: 10/09/2023
TRIAL JUDGE: HON. ELEANOR JOHNSON PETERSON
COURT FROM WHICH APPEALED: HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT
ATTORNEYS FOR APPELLANTS: SHERIDAN ASHANTI SIMONE CARR
LEE DAVIS THAMES JR.
DREW McLEMORE MARTIN
RODERICK D. WARD III
LANCE L. STEVENS
JASON LEE NABORS
ATTORNEYS FOR APPELLEES: THEAR JULES LEMOINE
TAYLOR RENE LAMBERT
NATURE OF THE CASE: CIVIL - PERSONAL INJURY
DISPOSITION: AFFIRMED - 05/13/2025
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., McDONALD AND McCARTY, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1. The City of Jackson contracted a company, Integrated Management Services Inc., to manage and oversee road improvement projects. In addition to IMS, the City engaged a construction company, Superior Asphalt, to perform the roadwork projects. The construction

company repaired and paved a new surface layer of asphalt on several of the City's main streets.

¶2. A year into the project, additional funding for IMS's services was denied, and its contract was not renewed. IMS's involvement ended, and its management role transitioned to the City's Public Works Department.

¶3. Ten months after the City took over managing the project, Superior Asphalt sent one of its employees to make a manhole cover flush with the new level of asphalt. The employee used a metal ring and shims to raise the cover to be even with the newly paved surface.

¶4. About a week later, Francis Fortner, a high school senior, was driving down the road. When she drove over the manhole, her car flipped. She passed away from her injuries.

¶5. Her parents sued the City of Jackson, Superior Asphalt, IMS, and their subcontractors. Superior Asphalt settled with the parents. The trial court granted two motions for summary judgment in IMS's favor, but the parents' action against the City is still pending.[1] Finding no error, we affirm on appeal.

## STATEMENT OF FACTS

¶6. The facts leading to this lawsuit are more or less uncontested.

*City of Jackson's Capital Improvement Program*

¶7. In 2014, the citizens of the City of Jackson passed a one-percent sales tax into law.

---

[1] The trial court confirmed the summary judgment orders were final pursuant to Mississippi Rule of Civil Procedure 54(b). The parents filed a notice of appeal from the summary judgment order, as did the City concerning its cross-claim against IMS.

The City planned to use the revenue for infrastructure improvements. After the tax law was passed, the City implemented the Capital Improvement Program, which provided for improvements to roads, bridges, drainage, and wastewater infrastructure throughout Jackson. The Program was administered by the One Percent Sales Tax Commission.

¶8. One of the many projects under the Program was the "Major Streets Project." The Major Streets Project involved milling, repairing, and resurfacing certain streets in Jackson. The Project included Gallatin Street, Raymond Road, Greenway Drive, McRaven Road, Adkins Boulevard, Northside Drive, Ridgewood Road, and Briarwood Road.

*IMS and the City's Program Management Agreement*

¶9. The City of Jackson contracted Integrated Management Services Inc. and IMS Engineering Inc., collectively "IMS," to serve as the Program Manager for the improvement program. IMS signed an Agreement with the City dated December 15, 2015, which stated, "Owner hereby engages Program Manager [IMS] to assist Owner with the management of the Program[.]" The contract term was for three years, subject to yearly renewal dependent on the Commission's approval and appropriation of funding. The terms of the Agreement specifically stated that IMS's "Program Management" services for the "Year 1" term were to begin on January 1, 2016, and end on December 31, 2016.[2]

---

[2] Pursuant to the Agreement, "Sixty days before the end of [Y]ear 1 . . . Owner and Program Manager will meet to agree upon the specific program management tasks for the next contract year. No later than 45 days before the end of Year 1 . . . Program Manager shall provide Owner with a proposed budget for the specific program management tasks agreed upon."

¶10. IMS was "to assist and monitor procurement procedures, design, construction, and other related activities to facilitate effective management of the Program . . . ."

¶11. The Agreement then specified, "The standard of care for all professional services performed or furnished by Program Manager under this Agreement will be the care and skill ordinarily used by members of the subject profession providing similar services under similar circumstances." Further, under the section titled "Standards of Performance," the parties stipulated:

> **Program Manager shall not be responsible for the acts or omissions of any Contractor, or of any of a Contract's subcontractors, suppliers, agents, or employees or any other persons at a Site** . . . .

(Emphasis added).[3]

¶12. The document further provided, "Nothing in this Agreement shall be construed to create, impose, or give rise to any duty owed by Owner or Program Manager to any Contractor, Contractor's subcontractor, supplier, other individual or entity, or to any surety for or employee of any of them."

¶13. Pursuant to the Agreement, the City of Jackson was required to approve the specific tasks and services to be completed each year. These specific tasks and services were then required to be provided to IMS through an official "Task Order."

---

[3] The Agreement also stated, "If Program Manager provides services during the construction phase of a Specific Project, *Program Manager shall not supervise, direct, or have control over a Contractor's work, nor shall Program Manager have authority over or responsibility for the means, methods, techniques, sequences, or procedures of construction selected or used by a Contractor . . . .*" (Emphasis added).

4

¶14.   The tasks for Year 1 were already decided by the time IMS entered into the Agreement in December 2015, and a Task Order for Year 1 was attached.  Task Order 1 described IMS's duties as: "The professional services rendered to plan, manage and implement the capital improvement infrastructure program projects identified to be undertaken with the one [per]cent sales tax as identified in the Year 1 budget."

¶15.   In particular, Task Order 1 identified the following tasks to be undertaken during Year 1: "Program Management Services; "Program (CIP) Implementation;" "GIS Support;" "Identification of External Funding Sources;" and "Public Communication and Outreach Strategy." The Task Order also specifically provided that three categories of services would only be undertaken "As required and defined by Owner," including the following: "Technical and Engineering Support for IMP Projects" "Urgent Need Investigation, Design, Construction Engineering and Inspection Services;" and "Technical Support on State and Federally Funded Projects."

*The City's Contract with Superior Asphalt for Road Work*

¶16.   After sending out notices for contractors to bid on the Major Streets Project, the City ultimately contracted with Superior Asphalt on September 16, 2016.  Superior's contract specifically provided "The CONTRACTOR agrees to furnish all materials in place and to faithfully complete all of said work contemplated by this Contract in good and workmanlike manner . . . ."

¶17.   Superior's contract also incorporated a document that required, "Any manhole within

5

8 ft. of the gutter face shall be milled around. Some manholes are higher than existing pavement and will be addressed in the field for whether they will be raised or not."

¶18.   IMS sent a letter to Superior stating, "[T]his letter is your Notice to Proceed to begin work on Monday, November 14, 2016." Once the notice to proceed was given to Superior, construction work began on the Major Streets Project.

*The Commission Stops Funding IMS*

¶19.   Despite IMS's quick start, the Commission quickly began to retract from the use of IMS services. The core dispute was money.

¶20.   At the Commission's meeting held on January 4, 2017, the minutes show the Commission denied funding to IMS for Year 2. IMS was told to continue their work only until the funding from Year 1 ran out.

¶21.   A month later, in February 2017, IMS sent an invoice for billable hours to the City. A cover letter was attached to the invoice, stating, "Please Note that the attached times sheets reflect the number of hours spent on this project," but "we are only billing for a fraction of the total hours in order to remain within the budget."  This was the last billed invoice from IMS. The City did not pay IMS after February 2017.[4]

¶22.   At the Commission meeting on June 14, 2017, the meeting minutes reflect a Commission member "stated that funds for the Program Manager (IMS) have been spent and

---

[4] Nonetheless, a time register log from IMS shows three employees logged unbilled hours in the month of June 2017, and two employees logged unbilled hours in July 2017.

that IMS is not present today." Then, at a Commission meeting on July 20, 2017, the minutes show the City's engineer stated that **"funding for the PM was depleted**. . . . **All work that was performed by the PM is being handled by City staff."** (Emphasis added).

*Timeline of the Construction Work on the Project*

¶23.    Meanwhile, the Major Streets Project proceeded. Contractors and subcontractors began work on Gallatin Street. The work then progressed onto Raymond Road, Greenway Drive, McRaven Road, and Northside Drive. During this time, Superior Asphalt purchased 100 manhole riser rings.

¶24.    Superior and its subcontractors then proceeded to milling on Ridgewood Road around May 2017. "Daily Time Sheet[s] for Crews" reflect that Superior's employees worked on leveling Ridgewood Road in May and June of 2017. Then in July 2017, timesheets reflect that Superior's employees patched a pothole on Ridgewood Road.

¶25.    Subsequently, in September 2017, at a Commission meeting, the City's Engineer relayed "that Superior is working on surface paving on Ridgewood Road; their subs are working on sidewalks." As told by an affidavit from an employee of Superior, from September 2017 through December 2017, Superior had delivered asphalt materials to Ridgewood Road.

¶26.    Then Robert Lee, the City's Engineer, conducted a walkthrough of the Major Streets Program streets with Superior representatives Robert Bullock on April 17, 2018, and Arthur Aguirre on May 8, 2018, during which Lee created a "punch list" of items that still needed

7

to be completed. The formalized "punch list" letter (sent after the fact to Superior on May 24, 2018) shows that the "punch list" contained a section for Ridgewood Road that included, "Raise all low valves, manholes, and appurtenances."

¶27. On May 10, 2018, an email from Superior's Assistant Project Manager, Nicole Williams, to the City's engineer, Robert Lee, stated,

> As per our conversation, we are having issues with the raising of the manholes on Ridgewood, due to the fact that they are not just castings, they are concrete pad enforced castings. This will require a change order for us to remove the concrete and raise the casting and re-concrete or retro-fit the castings and still have to remove the concrete slab which will also require a change order. Please advise as to the direction you wish to proceed.

¶28. An employee of Superior, George Creel, testified he was dispatched to make adjustments to the subject manhole. Creel made the determination as to how to raise its cover on the Thursday or Friday of the week before the accident, which would have been May 10 or May 11, 2018.

¶29. Creel testified that "the asphalt was place[d] on a Friday. . . within a week ahead of [the accident] or something like that." He stated, "They repaved the roadway, and in doing so it's just a matter of adjusting the height. . . . [T]he tops of the manholes may have been a little lower or something where it wouldn't be traffic ready . . . ." So "you temp it out and adjust it to the grade you need to get back to a finished grade[.]" Creel further explained, "the Thursday before we come in and cut the asphalt. And then that Friday we come in and removed it . . . ." Creel's testimony makes clear that he did not ask anyone from the City about how to execute the manhole adjustment.

8

¶30.    Creel said he removed "[p]robably [a] minimum of two inches, three inches" of asphalt when he cut it out. He testified, "You necessarily didn't go all the way down through the existing road base when you remove the new layer of asphalt," and with this subject manhole, he could see "it had broke rings on it." Then, "I replaced them, because we had extra rings on the truck. And that one there [subject manhole] had a broke ring on it, and I went ahead and replaced it and I went and put it back in place." He continued, he "had the rings and brought the paving in and put the paving in . . . . And then during that time we popped – cut the asphalt behind it and cleaned it out so we'd get a heavy course of asphalt back around the rings."

¶31.    On the morning of May 17, 2018, Jackson Police Department officers were dispatched to Ridgewood Road. A driver's tires blew out after driving over the manhole cover. JPD found the manhole cover unseated, so they called the City's Public Works Department, informing them of the problem. This call is reflected in the Public Works Department notes from that day. JPD placed the cover back onto the manhole.

¶32.    Several hours later, Frances Fortner was heading to her graduation practice at Jackson Academy. She was on Ridgewood Road in Jackson and drove over the same exact manhole cover. As she struck the manhole, she lost control of the car, and the car flipped. She did not survive the incident. She was three months past her 18th birthday. No one from the Public Works Department had yet visited the scene.

**PROCEDURAL HISTORY**

9

¶33. The Fortners filed a negligence suit against four defendants, including the City of Jackson, Superior, and IMS.[5] Shortly after the suit was filed, the Fortners settled with Superior and submitted a notice of voluntary dismissal with prejudice. The Fortners later filed their second amended complaint. The City then filed a cross-claim against IMS. The City claimed indemnity, negligence, and breach of contract based on their argument that IMS and Superior maintained, repaired, constructed, and managed Ridgewood Road.

¶34. After discovery, the parties filed dueling dispositive motions. IMS filed a motion for summary judgment. IMS claimed that it satisfied its duties while assigned to the project and that Superior's adjustments were made after IMS left and were outside IMS's control. IMS further argued that Superior's adjustments deviated from specifications and industry standards, creating causation issues that precluded IMS from liability.

¶35. The Fortners filed a motion for partial summary judgment. They claimed IMS's contract created a duty for all phases of the project that did not end when IMS left the Project, and they alleged IMS allowed the improperly fitted riser ring to be installed on the manhole.

¶36. The trial court entered an order finding that "there was no duty of care owed to Plaintiffs by IMS" and that it was "clear that IMS owed no legal duty to Plaintiffs." The court determined:

---

[5] Sigma Corporation, the manufacturer of the riser ring, was also named as a defendant. Sigma Corporation was dismissed from the lawsuit before this appeal. Similarly, a subcontractor of IMS, TMM Hall, was also named as a defendant and later dismissed.

At the time of the accident, Superior, as contractors, reported to the City. It was Superior's employee who "adjusted"/manipulated/leveled the Subject Manhole in a manner inconsistent with its requested relief. In addition, Superior, not IMS, removed traffic control devices immediately following the manipulation/leveling process, allowing traffic to flow over the Subject Manhole. Superior, not IMS, failed to get approval from the City before the riser ring and shims were placed on the Subject Manhole and, then, failed to get approval to remove traffic control devices after the riser ring and shims were placed.

¶37. The order further stated that "IMS's role(s) and any duties attached thereto, ceased on its last day under the contract with the City," and "there is no evidence to assert that IMS had any lingering duty based on its acts while under the contract." The trial court found IMS was "relieved from the Project in July 2017;" Frances' accident happened "well after IMS' contractual duties were terminated;" and "there was no duty to inspect the manhole adjustments in 2018 nor to warn of any condition in May 2018" after IMS was "relieved from its managerial role."

¶38. The order also stated there was "no evidence to suggest that IMS placed an incorrect riser ring on the Subject Manhole before Superior found the concrete slab in May 2018" or "made changes to the Subject Manhole using a riser ring without approval from the City." Rather, there was actually evidence from the Fortners' expert that "hidden conditions . . . would be addressed with the owner or engineer-in-charge as they arise" and that "IMS was not on the project when the improperly fitted riser ringers were installed on the Subject Manhole." Consequently, the trial court found that IMS was entitled to summary judgment as a matter of law.

11

¶39. The court also separately granted IMS's motion for summary judgment on the City's cross-claim, finding there was no evidence connecting IMS to the project at the time of the accident. IMS was not the project manager at the time and did not contribute to the accident while they were on the project. The court found "IMS cannot indemnify the City for the City's own acts."[6]

¶40. The trial court granted the motions for summary judgment in favor of IMS and certified both rulings as final in accordance with Mississippi Rule of Civil Procedure 54(b). The Fortners and the City appealed.

**STANDARD OF REVIEW**

¶41. "An appellate court reviews a trial court's decision to grant a motion for summary judgment de novo." *McKean v. Yates Eng'g Corp.*, 210 So. 3d 1037, 1042 (¶18) (Miss. Ct. App. 2015). We must "determine whether summary judgment is proper by considering whether 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact . . . .'" *Hill v. City of Horn Lake*, 160 So. 3d 671, 675 (¶8) (Miss. 2015) (quoting M.R.C.P 56(c)).

¶42. "Issues of fact exist when one can draw more than one reasonable inference from uncontradicted facts" that are "material," meaning the fact "tends to resolve any of the issues

---

[6] The City filed a notice of appeal from the summary judgment order, which foreclosed recovery on the City's cross-claim against IMS for indemnification.

12

properly raised by the parties." *Id*. (quoting *Moss v. Batesville Casket Co.*, 935 So. 2d 393, 398 (¶16) (Miss. 2006)). But "[t]he moving party has the burden of demonstrating the absence of a genuine issue of material fact." *Id*.

## DISCUSSION

¶43. On appeal, the Fortners claim the trial court erred by granting summary judgment in IMS's favor because issues of material fact exist and warrant a trial. IMS argues summary judgment was proper because the evidence presented shows the City of Jackson took over the management role ten months before the accident, and the Fortners could not show that IMS was involved in creating the dangerous condition.

¶44. We find the evidence fails to show IMS owed a duty of care after its involvement ended. Instead, the evidence shows the duty transitioned to the City when it took over the management role, so we affirm the grant of summary judgment.

> **I.      IMS did not owe a duty to the driver at the time the hazard was created or encountered.**

¶45. The Fortners' second amended complaint asserts a claim of negligence against IMS and the City of Jackson. They allege the defendants "had a duty to exercise that reasonable care owed to protect the safety of all drivers . . . expected to be on premises being maintained, constructed, repaired, managed and/or controlled by them." Their complaint contends that "defendants breached said duty" on "May 17, 2018," when IMS and "their employees under their control caused and allowed unreasonably dangerous conditions to exist on said Ridgewood Road[.]"

13

¶46. The Fortners assert that the "unreasonably dangerous conditions" specifically at issue include the "manhole in the road that had an insecure, misplaced, mis-sized, and/or defective cover, some or all of which had been improperly installed, designed and/or manufactured in violation of industry standards."

¶47. "[T]o prevail on a negligence claim, the plaintiff must prove by a preponderance of the evidence each element of negligence: duty, breach of duty, [causation], and damages." *Patterson v. T. L. Wallace Const. Inc.*, 133 So. 3d 325, 331 (¶18) (Miss. 2013). Crucially, the "plaintiff must demonstrate duty and breach of duty *before any other element*." *Brown ex rel. Ford v. J.J. Ferguson Sand & Gravel Co.*, 858 So. 2d 129, 131 (¶8) (Miss. 2003) (emphasis added) (quoting *Strantz v. Pinion*, 652 So. 2d 738, 742 (Miss. 1995)).

¶48. "[W]hether a duty exists in a negligence case is a question of law to be determined by the court." *McKean*, 210 So. 3d at 1042 (¶19) (quoting *Enter. Leasing Co. S. Cent. Inc. v. Bardin*, 8 So. 3d 866, 868 (¶7) (Miss. 2009)).

¶49. The parties agree that "Mississippi law imposes on design professionals, including architects and engineers, the duty to exercise ordinary professional skill and diligence." *Id.* at (¶20). There is no dispute that at the beginning of the Major Street Project, IMS bore a duty according to this general rule. This appeal centers on whether IMS still bore a duty ten months after it was no longer being paid and no longer actively involved in the project.

¶50. A trio of cases from the turn of this century explain how and when a duty is imposed in cases of this type. In a key case on the duty of design professionals, an architect was hired

14

to design scaffolding for a construction project. *Id*. at 1042 (¶18). But the architect's drawing featured a piece of wood in a size that simply did not exist. *Id*.

¶51.    "Despite the fact that [the architect]'s design drawings were effectively impossible to follow, Yates Construction made no comment about [the architect]'s design." *Id*. at (¶21). "Instead of seeking clarification or revision from [the architect], Yates Construction acted on its own" and constructed the scaffolding based on its own plans. *Id*. Thereafter, a construction worker fell from the scaffolding and was injured. *Id*. After a suit was filed, an expert opined that "the details of the as-built scaffolding on the site are far from those in the design drawings," and "the cause of the failure did lie in the as-built scaffolding and not in the design on paper that was not used." *Id*. at (¶22) (emphasis omitted).

¶52.    We found this key fact dispositive in determining a duty had not attached because "the fact remains that there is no evidence that Yates Construction actually used his design," and "[i]nstead of seeking clarification regarding the fact that [the architect]'s design called for twenty-four-foot posts that could not actually be obtained, Yates Construction used its own design[.]" *Id*. In other words, "there is no evidence that [the architect]'s design caused the plaintiffs' injuries." *Id*. Further, "[w]ithout any evidence, there can be no genuine issue of material fact regarding causation. It follows that summary judgment is appropriate regarding the plaintiffs' negligent-design claim against [the architect] and Yates Engineering." *Id*. at

(¶23).[7]

¶53.     Like the scaffolding in *McKean*, the final construction of Ridgewood Road was fully in the hands of Superior and the City. The City of Jackson was the Project Manager at the time Ridgewood Road was being repaired and the manhole covers were being adjusted. Even if there had been a design by IMS regarding the Ridgewood manhole, ten months after IMS was gone, Superior sent an email to the City of Jackson asking for design help. Specifically, Superior asked the City, "[W]e are having issues with the raising of the manholes . . . . This will require a change order for us to remove the concrete and raise the casting and re-concrete . . . . Please advise as to the direction you wish to proceed." Just as we concluded in *McKean* with the architect whose design was not used, here we cannot find IMS had a duty when IMS did not design the manhole adjustment, and Superior did not construct it according to the specifications required by the contract.

¶54.     It is for this same reason that the testimony of the expert retained by the family does not create a genuine issue of material fact. Under the theory espoused by the expert, IMS was to inspect every road in the Major Streets Project, including Ridgewood Road, render design drawings for each individual manhole, and then supervise adjustments based on those designs. But the witness ultimately admitted that he had never worked on a job involving manhole adjustments and did not have personal experience with this type of project. Nor did

---

[7] Our Supreme Court later affirmed this Court's decision in *McKean v. Yates Eng'g Corp.*, 200 So. 3d 431 (Miss. 2016).

he cite any treatises or other sources supporting his view.

¶55.    While IMS counted the manholes on Ridgewood Road, IMS had left the project by the time the Major Streets Project had reached that phase on Ridgewood. Communications about the manhole construction, design, and adjustment were fully in the hands of Superior and the City, with Superior asking the City for design assistance. And the testimony of the person who actually performed the adjustment on the actual manhole, Superior's employee George Creel, was clear that he did not consult any outside design professionals for his adjustment and that he had not been given plans.

¶56.    Even if that had not been the case, the contract between IMS and the City expressly limited IMS's duties and mandated that the Project Manager "*shall not* supervise, direct, or have control over a Contractor's work[.]" (Emphasis added).

¶57.    In another case, a driver and a passenger were in a car that flipped while traveling through a construction area. *Chisolm v. Miss. Dep't of Transp.*, 942 So. 2d 136, 139 (¶2) (Miss. 2006). The driver passed away, and the passenger "suffered severe, permanent disabling injuries." *Id*. "[A] twelve to eighteen inch bolt" was found "lying next to the road" on the following day, and the heirs of the driver filed a lawsuit against the Mississippi Department of Transportation and its contractor. *Id*. The trial court found MDOT was immune and granted summary judgment, and the heirs appealed. *Id*. at 138 (¶1).

¶58.    The Supreme Court wrestled with the complex facts of the case, which echo those at hand in terms of which entity bore what duty, if any. Importantly, the Court determined that

17

even if there were a breach of the applicable standards, this was only useful "for assessing a breach of duty *only after* a legal duty has already been established." *Id*. at 143 (¶15) (emphasis added). And there was no proof that MDOT owed a duty for the work at the site; instead, "All of the evidence points to negligence by Great River, MDOT's independent contractor." *Id*. at 144 (¶21). For it was that company who "was responsible for the installation and maintenance of signage and warning devices and for debris removal from areas traveled by the public." *Id*. Reviewing the case de novo, the Court found there was no dispute that "[t]his construction project was executed by Great River's employees, and the plaintiffs have presented no evidence that MDOT's employees committed any act or omission that led to the accident." *Id*.

¶59.    As in the *Chisolm* decision, here the proof is that leading to the construction, revision, installation of the riser ring, and maintenance of the manhole points solely to Superior and to the City. It was Superior who purchased dozens of riser rings, determined the manhole needed to be raised equivalent to the newly paved Ridgewood Road, and installed it. After IMS left the Major Streets Project nearly a year before, it was the City who assumed the duty to approve the use of the riser ring and, as Project Manager, to inspect the finished manhole adjustments as performed by Superior.

¶60.    Furthermore, an email sent the week before the accident about the problems the contractor was having in adjusting the manholes on Ridgewood Road was sent by Superior to the City—with only those two entities in conversation. And under the actual terms of the

18

contract, it was plainly stated that IMS "shall not be responsible for the acts or omissions of any Contractor . . . at a Site[.]" As in *Chisolm*, the project was executed by Superior and administered by the City, and here the Fortners presented no evidence that IMS had a duty ten months after it had ceased being paid.

¶61. And in a noteworthy case addressing how and when a duty attaches, the Supreme Court reckoned with possible liability for multiple defendants after "an elderly Alzheimer's patient" in a nursing home died after "being attacked and bitten in her bed by fire ants[.]" *Rein v. Benchmark Const. Co.*, 865 So. 2d 1134, 1137 (¶2) (Miss. 2004). As in this case, her heirs had settled with some of the defendants, including the nursing home facility and a pest control company. *Id*. But summary judgment was granted as to three other defendants. *Id*.

¶62. A central issue on appeal was whether the landscape contractor named Growin Green owed a duty of care to the nursing home patient. *Id*. at 1146-47 (¶41). The Court first pointed out that "Growin Green is a landscape company, not a pest control company." *Id*. at 1143 (¶27). And as such, it "had a commitment only to maintain the lawn and shrubbery." *Id*. at 1147 (¶41). There was no specific grant of authority to handle pest treatment in the contract for services, and indeed, the nursing home contracted with a different company for pest control. *Id*. at 1146-47 (¶41). Nonetheless, there was expert testimony that "it is common for a landscape company to treat ant beds to protect its equipment." *Id*. at 1147 (¶41).

¶63. The Supreme Court was curt in its analysis: "[t]he fact that Growin Green was not *even employed* at the time of [the victim's] death supports our decision" to affirm because

the company "owed no duty of care whatsoever to [the nursing home] nor to [the victim] when the incident occurred." *Id*. (emphasis added). Crucially, even if the company had voluntarily assumed some duties, "[t]hat voluntary assumption would have terminated when the contract . . . terminated, one month before the attack" on the victim. *Id*. The Court affirmed summary judgment in favor of the landscape company. *Id*. at 1148 (¶44).

¶64. As in that case, there was expert testimony that IMS owed a general duty to Frances Fortner as a driver in Jackson. Yet just like the landscape company in *Rein*, any such duty would have ceased upon the time that IMS left the project and its services were terminated by the Commission. In *Rein*, a month before the victim was bitten to death, the landscape company was no longer working at the site. Therefore, the Supreme Court reasoned it could not bear any duty at that remote date. To the extent here that the parents claim IMS had voluntarily assumed some duties after the company had stopped being paid, even those voluntary actions had ceased months before the fatal accident.[8]

¶65. In all three of these cases, the court found the plaintiffs did not muster evidence that

---

[8] During IMS's managerial involvement, before construction work started, there were no design drawings prepared for *any* of the 99 manholes involved in the Major Streets Project—which encompassed 30 manholes on Ridgewood Road. Nevertheless, even if IMS had created such a design for the manholes, the facts show the manholes specifically on Ridgewood Road were wholly unique. The uncontested testimony by Superior's employee Creel was, "When we opened those up, they . . . were all brick domes." He commented, "I've seen the Romans build stuff like that on documentaries, but I ain't ever seen it built like that. I'm sure probably back in the thirties and forties it was done like that," but to Creel, it was "[u]nusual." Creel testified he had "been doing work for 50 years, and I've never come across that."

a duty was owed at the time of the injury suffered. We find the same result must be followed today as in those cases. Under Mississippi law, it is clear IMS owed a duty of ordinary care in the performance of its duties. But as these cases show, IMS ceased to owe this duty when its role as Program Manager ended, no later than July 26, 2017. The fatal accident that is at the root of this appeal occurred ten months after the City stopped paying IMS.

¶66. Furthermore, the uncontested evidence shows IMS's role as Program Manager was not approved or renewed by the Commission past Year 1. IMS was instructed by the mayor at the Commission meetings to continue services only until Year 1 funds were depleted. It appears IMS's only connection to Ridgewood Road was that it counted the number of manholes for the report sent to the bidders for construction work.

¶67. Even if IMS had a duty of care by voluntary assumption, the fact that IMS "was not even employed at the time" of Frances' accident or Creels' adjustment of the manhole supports the conclusion that IMS no longer owed a duty.

¶68. To some extent, the family argues that IMS had a duty to provide safe roads. But that duty is owed by the City of Jackson, not IMS. "The standard of care required of a municipality in its construction or maintenance of its streets [is] . . . 'the duty to exercise ordinary care to keep its streets reasonably safe for use by persons exercising reasonable care and caution.'" *City of Meridian v. King*, 11 So. 2d 830, 831 (Miss. 1943) (quoting *City of Greenville v. Laury*, 172 Miss. 118, 159 So. 121 (1935)).

¶69. After a de novo review of this lengthy record, we find that the heirs did not present

21

a genuine issue of material fact as to a duty owed by IMS at the time of the accident.[9]

## II. IMS did not have contractual duties to the driver at the time the hazard was created or encountered.

¶70. On appeal, the Fortners shift from the general negligence claim asserted in their second amended complaint and, instead, focus on the provisions of the construction contracts and whether IMS failed to undertake the obligations required under the contract.[10]

¶71. "A 'duty' can be assumed by contract[,] . . . but—although the distinction is not always maintained assiduously in our caselaw—not all contractual duties are duties of care." *Clausell v. Bourque*, 158 So. 3d 384, 390-91 (¶22) (Miss. Ct. App. 2015) (citing 65A C.J.S. *Negligence* § 774 (2010) (holding "[a]n allegation only of a breach of a contractual duty is not sufficient although it describes such breach as negligence")).

¶72. "[T]he breach of a contract (whether described as 'negligent' or not) is not actionable in tort under an ordinary negligence theory unless breaching the contract also breached a duty

---

[9] IMS argued in the trial court below that Superior's actions constituted superseding and intervening causes. Such questions are normally for the jury. *Rein*, 865 So. 2d at 1144 (¶31) (quoting *Hankins Lumber Co. v. Moore*, 774 So. 2d 459, 464 (Miss. Ct. App. 2000)). In some extreme circumstances, the breach is so far removed from any duty owed that our courts have ruled as a matter of law. *See Sturdivant v. Crosby Lumber & Mfg. Co.*, 218 Miss. 91, 65 So. 2d 291, 295 (1953) (finding no liability for injuries caused when lightning struck a power line, and then followed into a pump house, a planer mill, and arced thirty feet over a creek into a tree, down a vine, and then into a man's body). Because we halt our inquiry at the threshold level of duty, we need not address this issue.

[10] We agree with the following authority: "As a general rule, a claim which is not raised in the complaint, but, rather, is raised only in response to a motion for summary judgment is not properly before the court.'" *Clark v. Gen. Motors*, No. 3:14cv505-DPJ-FKB, 2016 WL 3574408, at *6 (S.D. Miss. June 23, 2016) (quoting *Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005)).

of care recognized by tort law." *Id*. at 391 (¶23). To be actionable, "[t]here must be a duty of care 'fixed by law and independent of the contract.'" *Id*. (quoting *Hazell Mach. Co. v. Shahan*, 249 Miss. 301, 317, 161 So. 2d 618, 624 (1964)).

¶73. Nevertheless, our supreme court has recognized that "a duty of care 'may sometimes have relation to obligations growing out of, or coincident with, a contract[.]'" *Id*. (quoting *Hazell*, 249 Miss. at 317, 161 So. 2d at 624). "Accompanying every contract is a common law duty to perform with care, skill and reasonable experience, and a negligent failure to observe any of these conditions is a tort as well as a breach of contract." *Id*. (quoting *George B. Gilmore Co. v. Garrett*, 582 So. 2d 387, 391 (Miss. 1991)).

¶74. "The determination of whether an action is on contract or in tort requires knowledge of the source or origin of the duty" specifically at issue. *Id*. at (¶24) (quoting *Hazell*, 249 Miss. at 317, 161 So. 2d at 624)). "If the cause of complaint is an act of omission or nonfeasance which, without proof of a contract to do what has been left undone, will not give rise to any cause of action, then the action is founded upon contract, and not upon tort." *Id*. (quoting *Hazell*, 249 Miss. at 317, 161 So. 2d at 624). "Whether the defendant owed the plaintiff a duty of care requires the consideration of public policy matters and is a question of law for the court." *Id*. at 390 (¶21).

¶75. The plaintiff in *Clausell* purchased new shower doors from Lowe's, and Lowe's paid an independent contractor to install them. *Id*. at 386 (¶3). The doors later fell off their track and injured Clausell's foot. *Id*. at 386-87 (¶3). Lowe's hired a third party, named Bourque,

23

to inspect the door installation and determine why the doors fell off and whether they were repairable. *Id*. at 387 (¶4). Bourque told Clausell the doors needed to be replaced and that he would be back to replace them, but he never returned. *Id*. Clausell filed a lawsuit for his injuries, "alleging that Bourque negligently failed to repair the doors, replace them, or warn Clausell of the danger." *Id*. at 386 (¶2).

¶76.  Clausell's amended complaint originally asserted Bourque was negligent for: "(1) Providing and selling defectively designed and manufactured shower doors; (2) Improper installation of shower doors; (3) Misrepresentation and negligent recommendations concerning the type of shower doors to be installed in the Clausell home; and (4) Failing to warn [Clausell] that the doors were not adequate or sufficient for the type of installation and use recommended by Lowe's." *Id*. at 388 (¶9). However, "over the course of the various motions, memoranda, counter-motions, and hearings," Clausell's "focus has changed to different claims." This Court found that on appeal, one of his arguments "now (apparently) claims that Bourque negligently failed to . . . replace the doors." *Id*.

¶77.  We found that "[e]ven if the promise was not gratuitous, Clausell's claim would still fail because he alleges a simple breach of contract rather than a negligence tort." *Id*. at 390 (¶21). Specifically, "Clausell does not allege Bourque negligently replaced the doors causing him to be injured; he alleges that Bourque failed to undertake the replacement in the first place." *Id*. at 391 (¶24). After review, this Court held that "even if Bourque had a contractual obligation to replace the doors, Clausell has failed to show that breaching that contract was

24

a breach of *a duty of care* that would expose Bourque to tort liability under a negligence theory." *Id*. at 392 (¶25) (emphasis added).

¶78. Similar to that case, the Fortners argue IMS breached a contractual obligation to perform engineering duties on Ridgewood Road.

¶79. In the Fortners' reply brief, they argue "IMS's negligent procurement practices, before they were dismissed from the project, contribute[d] to the dangerous condition[.]" They claim that "blaming" the "misfitting" riser ring ("the component parts of the manhole [that] have been admitted by IMS as a substantial cause of the Fortner tragedy"), "on the non-party company Superior Asphalt rather than themselves" is "an additional element of liability," because the Fortners believe IMS is "the entity who ordered those improper parts well prior to IMS's dismissal[.]"

¶80. Under *Clausell*, the Fortners had the burden to show IMS owed duties of care arising from the contract. They raise a multitude of facts and issues that they claim are in dispute. However, even taking their allegations in the light most favorable to the nonmovant, they cannot salvage their claim. The evidence presented fails to show IMS was under a corresponding duty of care for its contractual obligations with the City of Jackson. In fact, the plain language of the contract fails to show IMS ever had the contractual "duties" alleged and consequently cannot show any such breach by IMS.

¶81. The contract stipulated, "If Program Manager provides services during the construction phase of a Specific Project, *Program Manager shall not supervise, direct, or*

25

*have control over a Contractor's work, nor shall Program Manager have authority over or responsibility for the means, methods, techniques, sequences, or procedures of construction selected or used by a Contractor . . . .*" (Emphasis added).

¶82.   IMS's status reports show that the first time construction work was done on Ridgewood Road was during the last two weeks of May 2017, when Superior's subcontractor milled Ridgewood Road.

¶83.   Next, daily time logs from Superior showed that Ridgewood Road was being leveled in June 2017 and that a pothole was being repaired on July 25, 2017. A bid addendum for the Major Streets Project laid out the sequence of construction work Superior was to follow: mill, repairs to potholes and large cracks, repairs to failed areas of the road, "Placement of the Base Course or leveling of asphalt," and *then* "Placement of . . . surface course . . . on roadway." Therefore, as of July 26, 2017, Superior could not have reached the phase of surface paving yet.

¶84.   Furthermore, the records from Superior show that the earliest asphalt was delivered to Ridgewood Road was in August 2017. Asphalt was then delivered to Ridgewood Road on various occasions through December 2017. As such, the evidence indicates the earliest the paving was complete on Ridgewood was December 2017.

¶85.   The City's Engineer conducted site visits on April 17, 2018, and on May 8, 2018. The list he compiled of work to be performed included raising the manholes on Ridgewood Road. There is no evidence the manhole was adjusted prior to May 8, 2018.

¶86. The email from Superior's deputy assistant dated May 10, 2018, was sent directly to the City's engineer—not IMS. The email specifically informed the City's engineer that at that point in time, Superior was working on raising the manhole covers. However, their workers were having trouble raising the covers to grade and discovered the concrete slab underneath, so she asked the City's engineer for instructions on how Superior should proceed.

¶87. Most importantly, Superior's employee Creel testified that as part of his job, he did the work left on the "punch list" and that he was dispatched to raise the subject manhole cover on May 10 or May 11, 2018. He testified that he was the one who put in the riser ring and the shims to raise the cover. He further stated that he had not sought or received approval from the engineer before using the riser ring and shims. When Frances' accident occurred on May 17, 2018, *this* was the riser ring that was found to be broken.

¶88. Therefore, the evidence actually presented does not show that the work on Ridgewood Road was completed—let alone that the new asphalt on the road was even paved—at the time IMS's involvement ended. There is no evidence that IMS oversaw one round of construction work and then Superior subsequently conducted a second, separate round of milling, leveling, and paving. Instead, the evidence shows the opposite—IMS had left the project months before construction occurred. Furthermore, any duties and obligations were set by the contract and not by any action-based assumption of duty.

## CONCLUSION

¶89. It is well established that if the proof as to even "*one* element of a plaintiff's claim

fails, the defendant is entitled to summary judgment, despite any factual disputes regarding the remaining elements of the claim." *Waltman v. Eng'g Plus Inc.*, 264 So. 3d 758, 761 (¶8) (Miss. 2019) (emphasis added). The family has gathered extensive evidence about the actions and omissions that led to the tragic death of their daughter. But this evidence points to actions by Superior and omissions by the City. Despite the zealous advocacy of counsel for the family, there is no evidence against IMS in the context of their tort-based negligence allegations since IMS no longer owed a duty of care by the time the hazardous condition was created.

¶90.   IMS could not have contributed to the accident or injuries here because they were simply not involved. It was Superior and the City of Jackson—the Program Manager—who owed a duty. As such, we find summary judgment in IMS's favor appropriate and affirm the trial court's final judgments.[11]

¶91.   **AFFIRMED.**

**BARNES, C.J., WESTBROOKS, McDONALD, LAWRENCE, EMFINGER, WEDDLE AND ST. PÉ, JJ., CONCUR.  WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.  CARLTON, P.J., NOT PARTICIPATING.**

---

[11] Because we conclude the trial court correctly dismissed IMS, we need not address the City of Jackson's argument on appeal that the City was improperly foreclosed from recovering against IMS for indemnification. Pursuant to precedent, "[t]his ruling will prevent an allocation of fault" to IMS. *Kerr-McGee Corp. v. Maranatha Faith Ctr. Inc.*, 873 So. 2d 103, 107 (¶14) (Miss. 2004). Therefore, we affirm the trial court's order granting summary judgment on the City of Jackson's cross-claim for indemnification.